Submitted on record and briefs August 29, 1997, reversed in part; affirmed in part February 18, 1998

Jude HANZO,
*Respondent,*

*v.*

Paul dePARRIE,
*Appellant,*
*and*

STATE OF OREGON,
*Intervenor.*

(9603-02315; CA A94099)

953 P2d 1130

Paul deParrie filed the briefs *pro se*.

Katherine A. McDowell, Deborah K. Smith and Stoel Rives LLP filed the brief for respondent.

Hardy Myers, Attorney General, Virginia L. Linder, Solicitor General, and Robert M. Atkinson, Assistant Attorney General, filed the brief for intervenor.

Norman L. Lindstedt, Lindstedt & Buono, P.C., and Walter M. Weber, of counsel, New Hope, Kentucky, filed the brief for *amicus curiae* Catholics United for Life.

Before De Muniz, Presiding Judge, Deits, Chief Judge, and Haselton, Judge.

HASELTON, J.

Deits, C. J., concurring.

**HASELTON, J.**

Respondent Paul deParrie appeals from the judgment in this action under ORS 30.866, the civil stalking statute, in which petitioner Jude Hanzo sought and obtained a permanent stalking protective order (SPO) against deParrie.[1] We conclude, on *de novo* review, that petitioner failed to prove that respondent, on two or more occasions, engaged in conduct constituting "a threat or something that does not differ meaningfully from one." *State v. Rangel*, 146 Or App 571, 577, 934 P2d 1128, *rev allowed* 325 Or 367 (1997). Accordingly, we reverse the judgment granting the SPO.

At all material times, petitioner was the executive director of All Women's Health Services, a Portland health center that provides gynecological health care and counseling services, including performing abortions. In 1985, the clinic was the target of a mail bomb.

Respondent is a leader of Advocates for Life Ministries, a group that opposes abortion, and is also the editor of Life Advocate magazine. At various times, Life Advocate magazine has editorialized that the use of "godly force" is "morally justified" in defense of "innocent life." In addition, on two occasions, respondent signed declarations or manifestos of support for anti-abortionist activists who killed abortion providers. In 1993, respondent and 28 other activists signed the following statement concerning Michael Griffin, who shot and killed Dr. David Gunn in Pensacola, Florida:

> "We, the undersigned, declare the justice of taking all godly action necessary to defend innocent human life including the use of force. We proclaim that whatever force is legitimate to defend the life of a born child is legitimate to defend the life of an unborn child.

---

[1] In civil stalking proceedings, the party applying for relief is denominated the "petitioner" and the party against whom relief is sought is the "respondent." Obviously, that nomenclature can be confusing in an appeal like this, where the "respondent" below is the appellant and the "petitioner" below is the respondent. Nevertheless, for consistency and in accordance with our own rules governing designation of parties in briefs, ORAP 5.15, all references to "respondent" are to deParrie and all references to "petitioner" are to Hanzo.

"We assert that if Michael Griffin did in fact kill David Gunn, his use of lethal force was justifiable provided it was carried out for the purpose of defending the lives of unborn children. Therefore, he ought to be acquitted of the charges against him."

The primary sponsor of that declaration was a group called "Defensive Action," whose director, Paul Hill, also signed the statement. In July 1994, Hill shot and killed Dr. John Britton and James Barrett, Britton's escort, and wounded Barrett's wife at another clinic in Pensacola. Respondent and 30 others subsequently signed a declaration that reiterated the earlier declaration and stated that Hill's "actions are morally justified if they were necessary for the purpose of defending innocent human life."

In 1994, respondent described Shelley Shannon, who had attempted to kill Dr. George Tiller, a Kansas abortion provider, as "a hero."[2] In January 1995, respondent publicly stated that John Salvi was "morally justified" in killing two receptionists at a Boston abortion clinic.

There is no evidence that respondent himself has ever engaged in violent activity against abortion providers. Nor is there any evidence that he has ever directed others to engage in violent activities. Respondent has twice been arrested for trespass in connection with protests at abortion clinics, but the record does not disclose that he was convicted in either instance.

Although the record does not say so explicitly, it appears that, for some time before the spring of 1995, respondent had organized and participated in anti-abortion protests at the All Women's Health Services clinic. None of that activity, however, was directed to petitioner at her home.

In April 1995, that changed. Respondent and others initiated a so-called "S.H.A.M.E." ("Stigmatize, Harangue,

---

[2] Respondent was personally acquainted with Shannon, formerly an Oregon resident. They jointly participated in picketing Oregon clinics in the late 1980s and early 1990s.

In the fall of 1994, based, in part, on respondent's association with Shannon, the Multnomah County Sheriff's Office suspended a concealed weapons permit that respondent had obtained in 1992.

Agitate, Mortify, and Expose") campaign that centered on petitioner's home. Although the parties vehemently disagree about the specific purpose of that campaign—*i.e.*, whether it was intended to "coerce" and "terrorize" petitioner or merely to cause her to "reconsider" and "repent"—no one disputes that the S.H.A.M.E. campaign was *generally* calculated to bring anti-abortion efforts "home" to petitioner's personal life and personal space.[3]

Conduct and communications allegedly associated with the S.H.A.M.E. campaign gave rise to petitioner's stalking complaint. Specifically:

• On April 14, 1995, a copy of Life Advocate magazine was left on petitioner's doorstep and was distributed throughout her neighborhood. That issue included articles on a variety of anti-abortion activities and legal developments,[4] coverage of "rescue" operations, two pieces on an upcoming "no place to hide" campaign in Mississippi (which appears to be functionally indistinguishable from a S.H.A.M.E. campaign), and an essay by respondent, which commented on Planned Parenthood's alleged response to anti-abortion television advertisements and on reactions to anti-abortion signs at the Portland Rose Festival Parade. There is no direct evidence that respondent either personally delivered, or caused someone else to deliver, the publication to petitioner's residence and neighborhood. Although the publication includes references to abortion providers as "child killers," and an excerpt from an essay by a woman imprisoned for aiding and abetting the destruction of a clinic, it does not include any explicit advocacy of violence against abortion providers.

• On April 15, 1995, petitioner received, at her home, a postcard picturing a fetus on a cross, bearing the legend "Father, forgive them, for they know not what they do." On

---

[3] The "S.H.A.M.E." campaign was not directed solely against petitioner. Beginning at least as early as November 1994, respondent and other members of Advocates for Life Ministries picketed the homes of at least five other Portland area abortion providers. Other groups in the national anti-abortion movement have also staged home pickets.

[4] Among the articles was a summary of the United States Supreme Court's decision in *Madsen v. Women's Health Center*, 512 US 753, 114 S Ct 2516, 129 L Ed 2d 593 (1994), pertaining to picketing and other protest activities at abortion clinics.

the postcard was a handwritten note, "Please stop killing kids," signed, "a neighbor." Petitioner described the postcard as "a well-known Advocates for Life postcard"; there is, however, no direct evidence that respondent personally mailed the postcard or caused it to be mailed.

- On April 22, 1995, respondent led a group of approximately nine anti-abortion protestors who picketed on public streets and sidewalks in front of petitioner's home and distributed written materials in petitioner's neighborhood. Before initiating those activities, respondent gave the Portland Police Bureau written notice of the anticipated picket. Before picketing, respondent and the others distributed bumper stickers reading "Free Paul Hill, Jail Abortionists." They also passed out handbills that bore petitioner's picture, as well as her name, home address, and work telephone number. The handbill was captioned, "**YOUR NEIGHBOR IS AN ABORTIONIST**," and included the following text:

> "[Petitioner] lives comfortably in her home in your neighborhood because she makes good money as an abortionist who kills children.

> "Let her know that you think she should not kill children for a living.

> "Write her at the above home address or call her at her office."

During the ensuing picketing, respondent and the others stood on the public street and sidewalk in front of respondent's home displaying a large sign that read "FREE PAUL HILL! JAIL ABORTIONISTS!" and other signs bearing anti-abortion slogans, none of which advocated violence against abortion providers.[5] The picketing activity was peaceful and involved no direct interaction between petitioner and respondent or the other participants. There is no evidence that respondent or the others trespassed on Hanzo's property or, for that matter, even engaged in shouting or chanting.

---

[5] Respondent videotaped both the April 1995 demonstration and a subsequent demonstration, in January 1996. That videotape was received as an exhibit during the stalking proceeding. Much of our recitation of the details of those two demonstrations is based on our review of that videotape.

• In June 1995, Advocates For Life mailed a flyer to the medical director of petitioner's clinic. That flyer,[6] which was captioned "THESE ABORTIONISTS HAVE BEEN EXPOSED!", included the pictures, names, addresses, and telephone numbers of five abortion providers, including petitioner, with check marks indicating that their residences had been picketed on certain dates. The text of the flyer continued:

"All of these have had their grisly trade revealed to their neighbors and friends by Advocates for Life Ministries pickets and leafleting. Advocates is committed to the regular exposure of abortionists through peaceful, non-violent activism.

"IF YOU'RE AN ABORTIONIST WE WILL BE VISITING YOUR NEIGHBORHOOD SOON!"

The reverse side of the flyer showed a picture of the April 22, 1995, picket at petitioner's residence, with the caption, "An AFLM picket in front of abortionist Jude Hanzo's house," and the following text:

"Advocates For Life Ministries has exposed one abortionist a month for the last six months through home picketing, leafleting and other activities protected under the First Amendment.

"We plan to continue these activities as a public service so that patients, colleagues, neighbors, and friends of these abortionists will know that this person kills children for a living.

"Inside is a list of those already picketed and addresses and phone numbers where they might be contacted. Please use whatever influence you have to convince them to practice real medicine in keeping with their Oath.

**"COMING SOON TO YOUR NEIGHBORHOOD!"**

---

[6] One of petitioner's witnesses testified that the FBI refers to such mailings as "hit lists," in that they signal that certain individuals have been "singled out for an escalated level of harassment, intimidation, stalking and other activities."

● Later in June 1995, respondent called petitioner at her home, despite the fact that she had an unlisted phone number and had never given respondent her phone number. Petitioner asked respondent how he had obtained her phone number; he responded that it had appeared on an Advocates for Life Ministries' caller-identification device;[7] she told him never to call again and then hung up. Respondent never called petitioner at her home again.

● Finally, on January 6, 1996, respondent and a group of between ten and fifteen others again engaged in pamphleting in petitioner's neighborhood and picketing of her residence. The handbills were similar to those distributed in April 1995; however, they included petitioner's unlisted home telephone number, in addition to her work number, and included the following text:

> "Hanzo is a notorious Portland child-killer who directs two Oregon abortuaries and resides in your neighborhood. She is also one of the abortionists involved in suing local activists to prevent them from conducting legal pickets and engaging in free speech debate on the issue.
>
> "Pray that she will repent of her child-killing. Write her at the above address or call her at her clinic * * * or home * * * to let her know that you think her abortion practice is wrong."

As with the April 1995 picket, respondent gave the police prior notice of the January 1996 residential picket, a police officer was present throughout and, as with the April 1995 picket, the January 1996 picket was peaceful and conducted entirely on public streets and sidewalks. The protestors carried a large sign bearing petitioner's photograph, with the words "ABORTIONIST" above and "Hanzo" below. They also carried other signs of various sizes and types, which included pictures of aborted fetuses with such captions as "Freedom of Choice?" and "Stop Abortion Now." Respondent himself carried a sign with a picture of an aborted fetus and the single word "Abortion."

---

[7] Petitioner testified that she sometimes called the Advocates for Life Ministries hotline because a recorded message would provide information about the S.H.A.M.E. campaign's forthcoming activities.

However, the January 1996 demonstration differed from the April 1995 demonstration in one material respect. Unlike the earlier demonstration, in which there was no direct interaction between petitioner and respondent or any of the protestors, the January demonstration involved interaction—and, indeed, confrontation.

The videotape of the January 1996 demonstration, *see* 152 Or App at 530 n 5, shows the protestors standing uneventfully on the sidewalk for approximately 40 minutes. At that point, respondent announced that the group would conduct a "Jericho walk," which consisted of walking around the block carrying their signs. When only one or two of the protestors remained on the sidewalk in front of her home, petitioner emerged from her front door and ran, cutting across the lawn, pursuing the other protestors who were moving away from her home. A few seconds later, two other women, carrying coffee mugs, emerged from the house and walked across the lawn to join petitioner. The women, including petitioner, positioned themselves behind the bulk of the picketers, walking beside some of the picketers in the street and on the parking strip.

The groups exchanged comments, with the women in petitioner's group initiating the interaction by telling the protestors that they were "invading private space." The women told the protestors to "get out of this neighborhood; we don't want you here" and "be gone." One of the women taunted the protestors for hiding their faces behind their signs. The protestors responded with statements such as, "You kill babies," "You're a murderer," "You're rotten to the core," and "You women are a disgrace."

During that exchange, which lasted several minutes, petitioner took photographs of the protestors. The demeanor of both groups was somewhat confrontational; it was by no means a matter of one group engaging in aggressive conduct, while the other group cowered. The only person who appeared afraid was one of the protestors, a woman who left the group and walked out into the street toward the uniformed police officer, who was observing the protest from the other side of the street. Petitioner followed that woman, who

appeared intimitated when petitioner approached and took her photograph.

Throughout the exchange, respondent stood several yards behind both groups, videotaping the scene and making no remarks. As petitioner and her companions turned back and walked towards her home, they said to respondent: "Here's Mr. Terrorist himself." "Jesus, Paul, go on a diet. You're disgusting." "American Coalition for Life Activists? How embarrassing; they can't show their face." One of petitioner's companions said to respondent, "Nobody's going to believe you're healthy or even sane. All they have to do is look at you." Respondent did not answer.

Petitioner and the other women with her then returned to her home and stood on her front walk. Respondent rejoined a couple of the protestors who had remained behind and were speaking with an unidentified woman. When the woman commented, "It is not reasonable to expect a human being, an adult person, to never have sex," respondent replied, "Yeah, you can't expect an adult to have self-control after all. Only kids can have it." The women in petitioner's group then remarked: "You oughta talk about self-control." "Yeah, really." "I've seen you in action * * * and it's pretty sickening."

A minute later, the remainder of the protestors returned from their walk, and petitioner and her companions went back inside the house. The protestors gathered for a prayer, which was conducted quietly. As they were praying, several of petitioner's companions left the house and slowly walked away. The demonstration ended shortly thereafter.

On March 26, 1996, petitioner filed a stalking complaint in Multnomah County Circuit Court seeking an SPO against respondent pursuant to ORS 30.866(1),[8] as well as attorney fees and costs pursuant to ORS 30.866(4)(c).[9] Petitioner alleged that each of the six incidents just described constituted an "unwanted contact" that had "alarm[ed] or

---

[8] The text of ORS 30.866(1) is set out below. 152 Or App at 540-41.

[9] ORS 30.866(4)(c) provides that a prevailing "plaintiff" may recover "[r]easonable attorney fees and costs."

coerce[d]" her, and she sought to enjoin respondent from contacting her in nine of the eleven ways described in ORS 163.730(3).[10] *See* ORS 163.730 (definitions in ORS 163.730 apply to ORS 30.866). Petitioner asserted that, given respondent's consistent declarations in support of those who have committed violence against abortion providers, as well as a nationwide escalation of violence against abortion providers and, particularly, those who have been "targeted" by certain anti-abortion groups, it was objectively reasonable for her to have been alarmed by respondent's alleged conduct.

Respondent, appearing *pro se*, filed an answer, which included counterclaims for "infliction of emotional distress" and for deprivation of civil rights under 42 USC § 1983. Respondent also filed a variety of pretrial motions, all of which were denied.[11]

In May 1996, following a two-day hearing, the trial court issued a permanent SPO. The trial court found that respondent had organized and led the April 1995 and January 1996 demonstrations outside petitioner's home, and it identified those demonstrations as the "predicate contacts" upon which it based its ruling. The court further found that those demonstrations were part of a "S.H.A.M.E. campaign"

---

[10] Petitioner sought to restrain respondent from:

"a) Coming into the visual or physical presence of petitioner (ORS 163.730(3)(a));

"b) Following petitioner (ORS 163.730(3)(b));

"c) Waiting outside petitioner's home or place of work (ORS 163.730(3)(c));

"d) Sending or making written communications in any form with petitioner (ORS 163.730(3)(d));

"e) Speaking with petitioner (ORS 163.730(3)(e));

"f) Committing a crime against petitioner (ORS 163.730(3)(g));

"h) Communicating with business entities with the intent of affecting petitioner's rights or interests (ORS 163.730(3)(i));

"i) Damaging petitioner's home, property or place of work (ORS 163.730-(3)(j));

"j) Delivering directly or through a third person any object to petitioner's home, property or place of work (ORS 163.730(3)(k))."

[11] Respondent assigns as error the rulings on those motions. However, given the nature of our disposition, we need not, and do not, address those assignments of error.

directed against petitioner and that those contacts were calculated to alarm or coerce petitioner into ceasing her abortion-related employment. Finally, the court found that, given "the intensity of the contacts and their potentially violent and confrontational nature," it was objectively reasonable for petitioner to feel alarmed or coerced and that she was in fact alarmed or coerced. In addition to issuing the SPO, the court awarded petitioner attorney fees pursuant to ORS 30.866-(4)(c).[12]

On appeal, respondent raises twelve assignments of error, many of which pertain to rulings on pretrial motions and some of which broadly challenge the constitutionality of the stalking statutes on their face and as applied to the facts of this case. In particular, respondent's eleventh assignment of error asserts broadly, albeit somewhat inartfully, that issuance of a permanent SPO on the basis of the "contacts" alleged and proved here offends the free expression protections of both the Oregon Constitution and the United States Constitution. As amplified below, we agree and reverse on that basis. Accordingly, we do not consider respondent's other assignments of error.

■　　　Before addressing the substance of respondent's eleventh assignment of error, we must clarify our standard of review on questions of fact underlying the issuance of SPOs. ORS 30.866 does not specify any standard of review, and we have never previously resolved that question.

■■　　The classification of a claim, for standard of review purposes, depends upon "the essential nature of the case, including the nature of the relief sought." *State Farm Fire v. Sevier*, 272 Or 278, 299, 537 P2d 88 (1975). When a claim arises from a statute, we examine the statute to determine whether the legislature intended the claim to be legal or equitable in nature. *See Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 322 Or 406, 414-19, 908 P2d 300 (1995), *mod on other grounds* 325 Or 46, 932 P2d 1141 (1997). Legislative

---

[12] The trial court's judgment, from which this appeal was originally taken, did not adjudicate respondent's counterclaims. However, upon remand pursuant to *former* ORS 19.033(4) (now ORS 19.270(4)), the trial court entered an amended judgment dismissing the counterclaims. Respondent does not assign error to the dismissal of his counterclaims.

and judicial treatment of claims arising under analogous statutes is pertinent to that inquiry.

Here, two cases involving the Family Abuse Protection Act (FAPA), ORS 107.700 to ORS 107.732, are particularly enlightening as to the proper standard of review of civil SPOs issued pursuant to ORS 30.866. Similarities between the two statutory schemes, in structure—and, to a large extent, in purpose—are apparent. In *State ex rel Hathaway v. Hart*, 300 Or 231, 241-42, 708 P2d 1137 (1985), the Supreme Court concluded that a defendant in a criminal contempt proceeding for violating a restraining order under FAPA is not entitled to a trial by jury, because a FAPA "restraining order is analogous to traditional injunctions preventing spouses from harassing each other during a pending divorce suit." In *Strother and Strother*, 130 Or App 624, 629, 883 P2d 249 (1994), *rev den* 320 Or 508 (1995), we concluded that, given *Hathaway's* analysis, FAPA restraining orders are "decrees in a suit in equity" and, thus, subject to *de novo* review under *former* ORS 19.125(3).[13]

SPOs issued under ORS 30.866 provide relief similar to that provided by FAPA orders, *i.e.*, injunctive relief preventing one party from engaging in conduct with respect to another party. Both are intended to forestall potentially violent interaction. Given those similarities, we conclude that, as with FAPA orders, our review of SPOs issued pursuant to ORS 30.866 is *de novo*.[14]

Proceeding to the merits, respondent asserts generally that the issuance of the SPO in the circumstances presented here was unconstitutional. Respondent's fundamental argument, as we understand it, is that the "contacts" upon which the issuance of the SPO was premised involved constitutionally protected expression. That argument is not framed explicitly in the terms of our analysis of the stalking statutes

---

[13] *Former* ORS 19.125(3) (now ORS 19.415(3)) states:

"Upon an appeal from a decree in a suit in equity, the Court of Appeals shall try the cause anew upon the record."

[14] Under ORS 30.866(1) and (4), a petitioner in a civil stalking proceeding may also recover monetary damages. Because petitioner here did not seek damages, we need not consider what our standard of review would be in the event a petitioner sought or recovered such relief.

in *State v. Rangel*, 146 Or App 571, 934 P2d 1128, *rev allowed* 325 Or 367 (1997), and *Delgado v. Souders*, 146 Or App 580, 934 P2d 1132, *rev allowed* 326 Or 43 (1997), which were decided after the issuance of the SPO in this case. However, the ultimate success of that argument depends on our analysis in those two cases and, particularly, in *Rangel*.

In *Rangel*, we sustained ORS 163.732, which describes the crime of stalking, against a facial overbreadth challenge. Our analysis implicated two statutes, ORS 163.730 and ORS 163.732. ORS 163.730, which applies equally to civil and criminal stalking proceedings, provides, in part:

"As used in ORS 30.866 and 163.730 to 163.750, unless the context requires otherwise:

"(1) 'Alarm' means to cause apprehension or fear resulting from the perception of danger.

"(2) 'Coerce' means to restrain, compel or dominate by force or threat.

"(3) 'Contact' includes but is not limited to:

"(a) Coming into the visual or physical presence of the other person;

"(b) Following the other person;

"(c) Waiting outside the home, property, place of work or school of the other person or of a member of that person's family or household;

"(d) Sending or making written communications in any form to the other person;

"(e) Speaking with the other person by any means;

"(f) Communicating with the other person through a third person;

"(g) Committing a crime against the other person;

"(h) Communicating with a third person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person;

"(i) Communicating with business entities with the intent of affecting some right or interest of the other person;

"(j)   Damaging the other person's home, property, place of work or school; or

"(k)   Delivering directly or through a third person any object to the home, property, place of work or school of the other person.

"* * * * *

"(7)   'Repeated' means two or more times."

ORS 163.732 provides, in part:

"(1)   A person commits the crime of stalking if:

"(a)   The person knowingly alarms or coerces another person or a member of that person's immediate family or household by engaging in repeated and unwanted contact with the other person;

"(b)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

In *Rangel*, in sustaining ORS 163.732, we applied the same sort of "narrowing construction" that the Supreme Court employed in sustaining the harassment statute, now codified as ORS 166.065(1)(c), in *State v. Moyle*, 299 Or 691, 705 P2d 740 (1985):

"Although, unlike [the harassment statute at issue in *Moyle*], the stalking statute does not expressly require that a 'threat' be made to the victim, a combination of provisions in ORS 163.730 and ORS 163.732 makes it clear that a threat or its equivalent must have been made in order for the crime of stalking to be found: ORS 163.730(1) defines 'alarm' as meaning 'to cause apprehension or fear resulting from the perception of danger'; ORS 163.730(2) defines 'coerce' as entailing 'force or threat'; and ORS 163.732(1)(c) requires that the victim's apprehension must relate to his or her personal safety or that of a family or household member. Considered together with the requirements of ORS

163.732(1) [(b) and (c)], that the alarm be subjectively experienced and objectively reasonable, these provisions demonstrate that, at least where the alleged activity is carried out in whole or in part by communicative means, *proof of stalking requires the establishment of a threat or something that does not differ meaningfully from one: For the victim to have an objectively reasonable fear or apprehension of a danger to personal safety, the communication giving rise to the fear must* **reasonably** be perceivable as threatening.

"[T]he term 'knowing,' as used in this statute, is subsumed in the meaning of 'intentional.' ORS 163.732 requires that the victim's alarm be objectively reasonable and that its focus be on the victim's personal safety or that of someone personally close to the victim. We agree with the state's suggestion that *the requisite subjective and objective conditions for the application of the stalking statute could not exist if the actor had not communicated the intent and did not have the ability to cause the harm that the victim reasonably fears*. Here, as in *Moyle*, the need to show the actor's intent and ability to carry out the feared harm may be found in or implied from the statute, even though, here as there, 'the statute, as written, requires' proof of neither.

"Further, if the threatened harm to personal safety is *itself* intended by the actor, it is highly unlikely that the alarm that the *communication* of the threat engenders would not also be intended. Therefore, analogously to the court's implication in *Moyle* that the threatened harm must be intended under a statute that specified only the victim's alarm must be intentionally caused, we interpret the stalking statute to require proof that the alarm as well as the threatened act must be intended by the speaker." *Rangel*, 146 Or App at 577-78 (some emphasis supplied).

In *Delgado*, we affirmed the issuance of a civil SPO under ORS 30.866. There, the respondent, who had no acquaintance with the petitioner, had repeatedly, and for no apparent reason, appeared outside the building where the petitioner lived and put himself in close proximity to the petitioner on sidewalks, in a library, and in other public places. *Delgado*, 146 Or App at 582. In sustaining the SPO, we considered a variety of constitutional challenges to ORS 30.866(1) and to ORS 163.730 as incorporated into the civil stalking statute. ORS 30.866(1) provides:

"A person may bring a civil action in a circuit court for a court's stalking protective order * * * against a person, if:

"(a)   The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

We rejected the respondent's argument that various terms in ORS 30.866—*i.e.*, "contact," "alarm," and "personal safety"— were impermissibly vague. Further, and of particular importance to this case, we held that, because none of the alleged predicate "contacts" in *Delgado* involved expression, it was unnecessary to address whether ORS 30.866 otherwise impermissibly restrained protected expression:

"[Souders] contends that the statute cannot be invoked against him 'without [evidence of a] genuine and imminent threat of violence which is necessary to remove the accused's actions from constitutional [speech] protection.' We held in *Rangel* that ORS 163.732, the criminal analog of ORS 30.866, could survive under the constitutional speech provisions only if construed in such a manner that the actor's expression giving rise to the victim's apprehension for safety must be accompanied by the intent and ability to commit the threatened harm. *That conclusion may be equally applicible to the civil stalking statute but it is unnecessary to decide that question here.*" 146 Or App at 585-86 (emphasis supplied).

Thus, in *Delgado*, we explicitly reserved the question of whether our construction of the criminal stalking statute in *Rangel*, as predicated on *Moyle*, applied equally to ORS 30.866.

We now reach and decide that issue. All of the alleged "contacts" in this case involved expression. The

proper construction of the statute, in turn, drives our assessment of respondent's "as applied" argument.

ORS 30.866(1) does not differ materially from ORS 163.732(1) with respect to the critical elements addressed in *Rangel*. The two statutes provide, respectively, as follows:

"(a) The person *intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other* person or a member of that person's immediate family or household *thereby alarming or coercing* the other person[.]" ORS 30.866(1) (emphasis supplied).

"(a) The person *knowingly alarms or coerces another* person or a member of that person's immediate family or household *by engaging in repeated and unwanted contact with* the other person[.]" ORS 163.732(1) (emphasis supplied).

In addition, ORS 30.866(1) (b) and (c), which require that the complainant's alarm or coercion be both subjectively experienced and objectively reasonable, are identical to ORS 163.732(1)(b) and (c). Further, although the remedies afforded by the civil and criminal stalking schemes differ somewhat, both implicate the coercive use of governmental authority, including criminal sanctions, to restrain conduct involving expression. *See, e.g.,* ORS 163.750(1) (defining crime of "violating a court's stalking protective order" as including violation of order issued under ORS 30.866). Given those material similarities, we conclude that our construction of ORS 163.732(1) in *Rangel* applies equally to ORS 30.866(1).

■     Thus, just as a criminal stalking prosecution can, constitutionally, be predicated on unwanted "contact" involving expression, so too can the issuance of a civil SPO under ORS 30.866. In both cases, however, the constitutionality of the statute's application depends on whether the statutory requisites distilled in *Rangel* have been satisfied: The underlying expression must represent "a threat or something that does not differ meaningfully from one"; the complainant must actually experience "fear or apprehension of a danger to personal safety"; and that alarm must be objectively reasonable. *Rangel*, 146 Or App at 577-78.

We begin with the requirement of a "threat or something that does not differ meaningfully from one." The civil and criminal stalking statutes do not define a "threat." Nor in *Rangel* did we. However, in two recent decisions, which also involved the construction of criminal statutes that did not include a definition of "threat" or "threaten," we employed the following dictionary definition of "threat":

> "**1:** an indication of something impending and usu[ally] undesirable or unpleasant * * * **a:** an expression of an intention to inflict evil, injury, or damage on another usu[ally] as retribution or punishment for something done or left undone * * * **b:** expression of an intention to inflict loss or harm on another by illegal means and [especially] by means involving coercion or duress of the person threatened[.]" *Webster's Third New International Dictionary* 2382 (unabridged 1993).

*See State v. Hall*, 149 Or App 358, 364-65 n 4, 942 P2d 882, *mod on other grounds* 149 Or App 757, 944 P2d 1000 (1997), *rev allowed* 326 Or 389 (1998) (construing ORS 164.395(1), which prohibits robbery in the third degree); *State v. Chakerian*, 135 Or App 368, 376-77, 900 P2d 511 (1995), *aff'd* 325 Or 370, 958 P2d 756 (1997) (construing "anti-rioting" statute, ORS 166.015).[15]

As noted, *Rangel* was predicated on *Moyle*. Although *Moyle* itself did not explicitly define "threat" or "threaten," it did describe certain attributes of constitutionally proscribable "threats." In *Rangel*, 146 Or App at 576-77, we quoted that description:

> "The statute, as written, requires neither proof of a specific intent to carry out the threat nor of any present ability to do so. However, the elements—actual alarm and the reasonableness of the alarm under the circumstances—have a similar purpose and effect. These elements limit the reach of the statute to threats which are *so unambiguous, unequivocal and specific to the addressee that they convincingly express to the addressee the intention that they will be carried out.* [*Moyle*, 299 Or] at 703-04." (Emphasis supplied.)

---

[15] *See also State v. Scott*, 63 Or 444, 447, 128 P 441 (1912) (construing then-current version of theft by extortion statute).

Consistently with *Rangel* and *Moyle*, we conclude that, at least where predicate "contacts" involve expression, a civil SPO can constitutionally issue only if that expression or other associated conduct so unambiguously, unequivocally, and specifically communicated the respondent's determination to cause harm that an objectively reasonable person in the petitioner's situation would fear for his or her personal safety, or for the safety of a member of his or her immediate family or household.

■ The contacts that petitioner pleaded and proved here did not meet that requirement.[16] We begin with the two incidents that the trial court characterized as "the predicate contacts"—the April 1995 and January 1996 demonstrations at petitioner's home.

Viewed in isolation, there was nothing "unambiguously" or "unequivocally" threatening about respondent's conduct during the April 1995 demonstration. As noted previously, *see* 152 Or App at 530, that demonstration was peaceful and was conducted entirely on public sidewalks and streets. The demonstration lasted for less than an hour and involved only a handful of protestors; there was no physical interaction between petitioner and any of the demonstrators, including respondent. The signs respondent and the others carried, and the pamphlets they distributed, did not urge violence against abortion providers. The only conduct that even alluded to such violence was the distribution of the "Free Paul Hill! Jail Abortionists!" bumper stickers and the display of a sign bearing the same legend. Whatever message of endorsement may have been conveyed by "Free Paul Hill," it is equally apparent that the sign and bumper stickers urged that abortion providers be "jail[ed]," not assaulted or killed.

Petitioner asserts, however, that neither the April 1995 demonstration nor the January 1996 demonstration, which we consider below, can, or should, be viewed in the abstract. She points, particularly, to: (1) the contemporaneous proliferation and escalation of violence against abortion

---

[16] Under ORS 30.866(1), a petitioner must prove "repeated" contacts. "Repeated" means "two or more times." ORS 163.730(7). As described below, we conclude that petitioner did not prove even a single actionable "contact" in this case.

providers, specifically including those who were "targeted" by certain anti-abortion groups; and (2) respondent's declarations of support for, and acquaintance with, persons who committed such violence.[17]

We reject petitioner's "contextual overlay" arguments for two related reasons. First, even if the declarations that respondent signed are reasonably read as advocating violence against abortion providers, that advocacy is abstract advocacy.[18] Nothing in the stalking statutes, as construed in *Rangel*, suggests that such advocacy alone, or even when coupled with manifestly nonviolent protest activity, can constitute an actionable "unwanted contact." Second, in a related sense, if petitioner were correct, then *any* contact between petitioner and respondent would, necessarily be an actionable "unwanted contact." That is, any contact—from saying "hello" to petitioner in a grocery store to peaceful picketing at her clinic—would be transmuted into an actionable "unwanted contact" by virtue of respondent's generic and constitutionally protected statements. Respondent's endorsement of the "defense of life" manifestos would, effectively, preclude him from engaging in any picketing/protest activity directed, not just against petitioner and her clinic, but against *any* abortion provider. ORS 30.866 does not, and cannot, yield that result.

In so holding, we emphasize that this is not a case in which respondent previously engaged in violence against persons in petitioner's position or had incited others to do so. Rather, as noted, there is no evidence that respondent has acted violently towards abortion providers—or indeed, towards anyone—or that he has directed anyone else to act violently.

---

[17] Petitioner also introduced evidence that respondent owned firearms and that his concealed weapons permit had been revoked, in part because of his declarations in support of persons who had committed violence against abortion providers. Petitioner did not, however, introduce any evidence that she was aware of those facts at the time of either of the two demonstrations.

[18] *See, e.g., Brandenburg v. Ohio*, 395 US 444, 447, 89 S Ct 1827, 23 L Ed 2d 430 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

We appreciate the practical consequences of our holding for petitioner and others in similar positions. It is unpleasant to be picketed at one's home—or even at one's office. But that is the essence of picketing. It is, no doubt, upsetting to be denounced as a "murderer" merely for assisting others to exercise their constitutional rights. But respondent, too, is entitled to exercise his constitutional rights, so long as his conduct is not unlawful.

Our assessment of the second demonstration, in January 1996, is similar. Again, that demonstration was peaceful; it did not involve any trespass or other unlawful activity. Because respondent had given prior notice to the Portland Police Bureau, a uniformed officer was present and visible. The signs the demonstrators carried and the pamphlets they distributed did not advocate violence against abortion providers. The only interpersonal contact between petitioner and respondent and the other demonstrators was contact that petitioner herself initiated, when she and some other women pursued the protestors as they were moving away from her house. The ensuing colloquy between the two groups did not involve any threats of violence. *See* 152 Or App at 533-34. We conclude that, given the totality of those circumstances, the second demonstration was not an actionable "unwanted contact" for purposes of ORS 30.866.

Although the trial court based its issuance of the SPO exclusively on the two demonstrations and did not consider the four other alleged "contacts," it is necessary on *de novo* review for us to consider the other four incidents. We conclude that none of those incidents constituted an actionable "unwanted contact." With respect to the delivery of the Life Advocate magazine to petitioner's residence, there is no evidence that respondent was personally responsible for that delivery. In all events, nothing in that publication—and, particularly, respondent's commentary—advocated violence against abortion providers, much less in such a way as to constitute an "unequivocal" and "unambiguous" threat against petitioner. The same is true of the postcard depicting the fetus on the cross, which simply bore the biblical quotation "Father, forgive them, for they know not what they do" and the handwritten notation "Please stop killing kids."

The fifth alleged "contact," the mailing of the flyer in June 1995, was insufficient for many of the same reasons. Nothing in that mailing espoused violence—and, indeed, the flyer stated that Advocates for Life Ministries "is committed to the regular exposure of abortionists through peaceful, non-violent activism." The message of the flyer was one of persuasion, not violence: "Please use whatever influence you have to convince [abortion providers] to practice real medicine in keeping with their Oath."

The final alleged "contact," respondent's June 1995 call to petitioner's unlisted home telephone number, was brief and did not involve any mention of abortion or violence. That call consisted entirely of respondent calling, petitioner asking him how he had obtained the unlisted number, respondent answering, and petitioner then telling respondent never to call again and hanging up. Respondent did not call again. We agree with petitioner that, although the content of the call was ostensibly neutral, respondent's reasons for making the call were hardly innocuous—that is, that he wanted petitioner to know that even her private phone number was not private, that she had "no place to hide" from respondent's anti-abortion efforts. Although such harassment was, no doubt, upsetting, it did not unambiguously and unequivocally communicate a determination to injure petitioner unless she ceased her abortion-related activity.

We thus conclude that none of the six alleged contacts satisfied the requisites for issuance of an SPO under ORS 30.866. Accordingly, the trial court erred in granting the SPO and in awarding petitioner attorney fees pursuant to ORS 30.866(4)(c).

Judgment on petitioner's complaint for issuance of stalking protective order and award of attorney fees reversed; judgment dismissing respondent's counterclaims affirmed.

**DEITS, C. J.,** concurring.

I agree with the majority's implicit conclusion that petitioner experienced no subjective alarm or apprehension as a result of respondent's contacts. Because that conclusion is independently dispositive of the appeal, I would not reach

and I express no view regarding many of the other issues that the majority decides.

It is unnecessary to the decision of this case to resolve the questions of whether any alarm that the contacts could have caused, but did not, would have been "objectively reasonable," ORS 30.866(1)(b), or whether the contacts entailed a constitutionally proscribable "threat." *See State v. Rangel*, 146 Or App 571, 934 P2d 1128, *rev allowed* 325 Or 367 (1997). I note in particular that I would not reach and, accordingly, do not join in the majority's disposition of petitioner's argument that respondent's alleged earlier declarations of support for violent acts against abortion providers may have bearing on the answers to those questions.

I concur in the result.