Argued and submitted August 1, 2000, order modified in part; otherwise affirmed
May 9, 2001

# K. H.,
## *Respondent,*

*v.*

# William Andrew MITCHELL,
## *Appellant.*

# 99DO0770ST; A108441

27 P3d 130

Charles F. Lee argued the cause for appellant. With him on the brief was Lee & Kaser.

No appearance for respondent.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

Armstrong, J., dissenting.

**KISTLER, J.**

Respondent appeals from a permanent stalking protective order restraining him from contacting petitioner.[1] Although respondent's actions warranted the issuance of a stalking protective order, the scope of the order that the court entered is too broad. On *de novo* review, we modify the order and affirm it as modified.

In 1999, petitioner was a senior in high school. Her parents worked, and she would typically be alone at home until she left for school. On March 1, 1999, the telephone began to ring immediately after petitioner's mother left for work. The first time petitioner answered, the caller hung up. The phone rang again. When she answered, a man disguising his voice said, "I want to eat your pussy." The phone rang a third time. This time, the caller said, "I want to fuck you."[2] Petitioner reported the calls to the police. The police report states that petitioner "expressed terror at the content of the calls and was at near hysteria." A telephone trap was placed on petitioner's phone to trace future calls.

On May 12, 1999, petitioner received three calls in rapid succession. Each time he called, the caller said, "I want some of that little pussy, I'll be right over." He added on at least one of the calls, "[S]o, what's your answer." Petitioner left the telephone off the hook and called the police on her cellular phone. She was, in the reporting officer's words, "hysterical."

---

[1] We explained in *Hanzo v. deParrie*, 152 Or App 525, 527 n 1, 953 P2d 1130 (1998), *rev den* 328 Or 418 (1999):

> "In civil stalking proceedings, the party applying for relief is denominated the 'petitioner' and the party against whom the relief is sought is the 'respondent.' Obviously, that nomenclature can be confusing in an appeal like this, where the 'respondent' below is the appellant and the 'petitioner' below is the respondent. Nevertheless, for consistency and in accordance with our own rules governing designation of parties in briefs, ORAP 5.15, all references to 'respondent' are to deParrie and all references to 'petitioner' are to Hanzo."

Similarly, in this opinion, all references to respondent are to Mitchell and all references to petitioner are to K. H.

[2] Several weeks earlier, petitioner had received three or four similar calls. The calls occurred at approximately the same time of day. As petitioner testified, "the calls happen the second my mom leaves for work." "[W]hen the first call comes is right when she walks out the door and her car's gone and that's when the call comes."

The police traced the May 12 calls to respondent's house. They spoke to respondent, who initially denied any knowledge of the calls. After being told that a trap had been placed on petitioner's telephone and that the calls had been traced to his home, respondent admitted making the calls on May 12 as well as the earlier calls.

On May 12, 1999, petitioner filled out and signed an Oregon Uniform Stalking Complaint.[3] On the same page, beneath the complaint, is an Oregon Uniform Stalking Citation. The citation names respondent and directs him to appear in court on May 17, 1999. The citation recites that the officer who issued the citation has probable cause to believe that respondent engaged in conduct prohibited by ORS 163.735 and that the officer has served respondent with a copy of the citation.

Following a hearing on May 17, 1999, the trial court entered a temporary stalking protective order against respondent and scheduled further proceedings on June 8, 1999, to determine whether a permanent stalking protective order should be entered. *See* ORS 163.738(2)(a)(A). Based on the evidence brought out at the June 8, 1999, hearing, the trial court entered a permanent stalking order directing that respondent have no contact with petitioner.

■      On appeal, respondent raises three issues. He argues initially that the case should have been dismissed because no complaint was filed in the trial court. Respondent's first argument is based on ORCP 3[4] and assumes that petitioner could initiate a hearing to obtain a stalking protective order only by filing a complaint with the clerk of the court. Because petitioner did not do that, respondent concludes that no action was properly before the trial court.

Respondent's first argument is based on the assumption that ORCP 3 applies to this proceeding. ORCP 1 A, however, provides that the rules of civil procedure do not apply

---

[3] In his brief, respondent asserts that no uniform stalking complaint was ever filled out or filed with the court. The trial court file, however, contains a uniform stalking complaint dated May 12, 1999, and signed by petitioner. The date stamp shows that the complaint was filed in the Douglas County court on May 13, 1999.

[4] ORCP 3 provides: "Other than for purposes of statutes of limitations, an action shall be commenced by filing a complaint with the clerk of the court."

"where a different procedure is specified by statute or rule." Here, ORS 163.735 and ORS 163.744 provide a different procedure for initiating actions to obtain stalking protective orders.[5] ORS 163.744 provides that "[a] person may initiate an action seeking a citation under ORS 163.735 by presenting a complaint [the form of which is specified in ORS 163.744(2)] to a law enforcement officer." ORS 163.744(1). ORS 163.735, in turn, provides that, if the officer has probable cause to believe that the respondent has engaged in prohibited conduct, the officer shall issue a citation to the respondent. The citation initiates a court proceeding to determine whether a stalking protective order should be issued. Petitioner followed that process here. No more was required.

■ Respondent raises a second issue. He argues that "[t]here was no threat" that could give rise to a stalking protective order. In his view, the evidence shows that he merely stated his desires over the phone and asked whether petitioner would agree to sexual activity. He appears to take the position that, in the absence of an explicit threat of forcible compulsion, the trial court could not issue a stalking protective order. We agree with the trial court that respondent's statements warranted issuing a stalking protective order.

As a statutory matter, a court may issue a stalking protective order when a person intentionally, knowingly, or recklessly engages in "repeated and unwanted contact" that alarms another person. ORS 163.738(2)(a)(B)(i). The resulting alarm must be objectively reasonable. ORS 163.738(2)(a)(B)(ii). Finally, the contact must cause the person to have a reasonable apprehension regarding his or her personal safety. ORS 163.738(2)(B)(iii). When a contact involves speech, the court has interpreted the stalking statute narrowly to avoid overbreadth concerns. *See State v. Rangel*, 328 Or 294, 301-03, 977 P2d 379 (1999). The court has required proof of a threat "that instills in the addressee a fear of imminent and serious personal violence from the

---

[5] ORS 163.735 and ORS 163.744 establish a process by which an officer, on receiving a complaint, may issue a citation that will result in the issuance of a stalking protective order. ORS 30.866 also authorizes a petitioner to file a petition for a stalking protective order in circuit court. In this case, petitioner followed the procedure set out in ORS 163.735 and ORS 163.744.

speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *Id.* at 303.[6]

On appeal, respondent does not dispute that the acts that he mentioned over the telephone would, if not consensual, constitute the crimes of sodomy and rape. He argues instead that he was merely asking petitioner whether she would consent to engage in those acts. We do not agree that respondent's statements had that benign connotation. Respondent made anonymous calls in which he stated, in unmistakable terms, what he wanted and that he was coming right over. Respondent's statements were not a request for consent. They instead conveyed a threat of a serious personal assault. His statements reasonably "instill[ed] in [petitioner] a fear of imminent and serious personal violence[.]" *Rangel*, 328 Or at 303.[7] They were unequivocal and objectively likely to be followed by unlawful acts.[8] *See id.*

■ Respondent argues finally that the stalking protective order that the court issued was too broad. Respondent and petitioner are neighbors. There was evidence that, before the calls started, respondent would stand on his deck and

---

[6] The court explained that "[t]hose characteristics of a threat 'exclud[e] the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.'" *Rangel*, 328 Or at 303 (quoting *State v. Moyle*, 299 Or 691, 705, 705 P2d 740 (1985)).

[7] The dissent reasons that the first set of calls in March cannot be considered an "unequivocal threat to go to [petitioner's] house within a few minutes of the calls and sexually assault her." 174 Or App at 272 (Armstrong, J., dissenting). The dissent raises the bar too high. *Rangel* does not require that a defendant unequivocally threaten to carry out his or her assaultive acts within a few minutes. Rather, it requires only that the threat be "objectively likely to be followed by unlawful acts." *Rangel*, 328 Or at 303. The dissent also concludes that the second set of calls in May was not threatening because, in the one of those calls, respondent said, "[S]o what's your answer." If a gunman told his victim, "I want your money," and later added, "So, what's your answer," the addition of the latter phrase would not turn a robbery into a consensual commercial transaction. The same is true here. Respondent's addition of the phrase, "So, what's your answer," in one of a series of three calls did not convert his threat of physical assault into a request for consent.

[8] Respondent does not argue that his statements were equivocal or that they were not objectively likely to be followed by unlawful acts. We note that, on May 12, he expressly stated that the threatened harm was likely to follow. To be sure, when he called earlier in March, he did not say that he was coming right over. But the timing of the call made clear that he was close enough to know when petitioner's mother left the house. Petitioner was reasonably concerned that the caller's proximity made the threatened harm imminent and objectively likely to follow.

stare at petitioner in a way that had made her "real nervous." As the trial court recognized, there is a need to protect petitioner from these sorts of visual contacts as well as from the calls that petitioner had been making. As the court also recognized, however, an absolute prohibition against respondent's coming into petitioner's visual presence would pose practical difficulties. Compliance with that condition would be difficult to achieve unless respondent moved out of his home.

■ Although aware of those competing concerns, the court entered a permanent stalking protective order indefinitely preventing respondent from having any contact with petitioner and defined the term "contact" broadly.[9] ORS 163.738(2)(b) provides that, if the court finds that a person has violated the stalking statute, it "*shall* specify the conduct from which the respondent is to refrain, which *may* include

---

[9] The order defined "contact" as:

"Coming into the visual or physical presence of the petitioner or the person to be protected if other than the petitioner.

"Following the petitioner or the person to be protected if other than the petitioner.

"Waiting outside the home, property, place of work or school of the petitioner or of the person to be protected if other than the petitioner or of a member of the petitioner's, or other person's immediate family or household.

"Sending or making written communications in any form to the petitioner or the person to be protected if other than the petitioner.

"Speaking by any means with the petitioner or the person to be protected if other than the petitioner.

"Communicating through a third person with the petitioner or the person to be protected if other than the petitioner.

"Committing a crime against the petitioner or the person to be protected if other than the petitioner.

"Communicating with a third person who has some relationship to the petitioner or the person to be protected if other than the petitioner with the intent of affecting the third person's relationship with the petitioner or the other person.

"Communicating with business or government entities with the intent of affecting some right or interest of the petitioner or the person to be protected if other than the petitioner.

"Damaging the home, property, place of work or school of the petitioner or the person to be protected if other than the petitioner.

"Delivering directly or through a third person any object to the home, property, place of work or school of the petitioner or the person to be protected if other than the petitioner."

all contact listed in ORS 163.730 and any attempt to make contact listed in ORS 163.730." ORS 163.738(2)(b) (emphasis added). The legislature's use of the word "shall" requires a court to enter a stalking protective order if it finds a violation of the statute, but its use of the word "may" makes clear that the scope of the order remains discretionary. *See Shook v. Ackert*, 152 Or App 224, 230, 952 P2d 1044 (1998) (recognizing that discretion). In exercising its discretion, a court should weigh the need to protect the victim against the restrictions placed on the respondent. *Cf. Martin v. Board of Parole*, 327 Or 147, 160 n 5, 957 P2d 1210 (1998).[10] On *de novo* review, we modify the reach of the court's order. *See PGE v. Duncan, Weinberg, Miller & Pembroke, P.C.*, 162 Or App 265, 986 P2d 35 (1999) (modifying the scope of a permanent injunction that swept too broadly).

We share the trial court's concern that its definition of contact, if applied with no qualification, would effectively force respondent to choose between moving from his home and being in violation of the stalking protective order. This record does not warrant that broad a remedy, and we conclude that the conflict can be resolved by limiting the definition of contact. We accordingly modify the order to prevent respondent from (1) intentionally communicating by any means with petitioner, either directly or through a third person; (2) intentionally initiating visual contact with petitioner; (3) intentionally following petitioner; (4) going onto petitioner's property, her place of work, or her school; and (5) waiting outside of her place of work or school. If this order proves insufficient to protect petitioner, petitioner may ask the court to modify it.

Order modified to prohibit respondent from contacting petitioner by intentionally communicating by any means with petitioner, either directly or through a third person,

---

[10] In *Martin*, the respondent had abused the victim "sexually, physically, and psychologically." 327 Or at 149. He "beat the victim thousands of time; he forced her to perform sexual acts with him and with another woman." *Id.* The Parole Board effectively excluded the respondent from entering the county in which the victim lived. The court noted "that a 'need to protect the victim' rationale is not a panacea; exclusion orders having a scope like that in the present case need greater justification than the fact that a victim exists." *Id.* at 160 n 5. In *Martin*, however, the court found that the harm that the victim had suffered justified the broad restriction that the Parole Board placed on the respondent. *See id.*

intentionally initiating visual contact with petitioner, intentionally following petitioner, going onto petitioner's property, her place of work, or her school, and waiting outside of her place of work or school. Order otherwise affirmed.

**ARMSTRONG, J.,** dissenting.

I reluctantly dissent from the majority's decision in this case. I do so reluctantly because defendant's reprehensible conduct is conduct against which plaintiff is entitled to be protected. Unfortunately, however, plaintiff apparently did not take the step required under Oregon law to make defendant's conduct criminal, and the police apparently did not advise plaintiff of that step. Furthermore, although I believe that the Oregon stalking law could be amended to cover defendant's conduct without violating the state or federal constitutions, the current law, as we have construed it, does not reach defendant's conduct. Consequently, the trial court erred by entering a stalking protective order under it.

Before I joined the court, I assisted the legislature in drafting ORS 166.090, the telephone harassment statute. That statute makes it a Class B misdemeanor to harass or annoy a person intentionally by causing that person's telephone to ring when the caller has no communicative purpose or by causing the person's telephone to ring "knowing that the caller has been forbidden from doing so by a person exercising lawful authority over the receiving telephone." ORS 166.090(1)(b). The statute replaced provisions of the harassment statute that were directed at obscene telephone calls. *Compare id. with former* ORS 166.065(1)(e) (1985). The legislature made the change because of a concern that the proscription in the harassment statute against obscene telephone calls violated the guarantee of free speech in Article I, section 8, of the Oregon Constitution. In other words, the legislature adopted ORS 166.090 to address the very conduct in which defendant engaged.

However, for the statute to apply to the statements that defendant made over the telephone to plaintiff, someone who had authority over the telephone that defendant called had to tell defendant that he was forbidden to call it. *See* ORS 166.090(1)(b). Apparently, no one told defendant that. Had someone done that, defendant could have been prosecuted for

violating the statute each time that he called plaintiff after having been forbidden to do so. Although the issue is not before us, I believe that the telephone harassment statute is constitutional under Article I, section 8, and under the First Amendment to the United States Constitution. I certainly believed that to be true at the time that I helped draft the statute, because the task that we undertook for the legislature was to draft a constitutional statute to replace the arguably unconstitutional obscene-telephone-call component of the harassment statute. Although criminal prosecution need not be the only way to resolve a problem, it certainly is one way that the legislature intended that conduct such as defendant's be addressed. It is unfortunate that it apparently could not be used under the facts of this case.

The stalking statutes represent a different approach to certain kinds of alarming or coercive conduct. In addition to imposing criminal penalties for engaging in the conduct that they prohibit, the stalking statutes give people affected by the conduct the ability to obtain a court order that prohibits violators from contacting them. *See* ORS ORS 163.732, ORS 163.738, ORS 163.750.

However, because the stalking statutes expressly restrict communication, they had to be written in a way that complies with the proscription in Article I, section 8, against the enactment of certain laws that restrain or restrict expression. So far, both we and the Supreme Court have held that the current version of the statutes complies with Article I, section 8, and with the First Amendment. In doing so, however, we have construed the statutes in a way that excludes defendant's conduct from the conduct that they cover. We held in *State v. Rangel*, 146 Or App 571, 577-78, 934 P2d 1128 (1997), that, to the extent that the stalking statutes expressly restrict communication, they cover only communication that constitutes a threat or its equivalent. *Id.*

The Supreme Court agreed with our interpretation of the stalking statutes. *State v. Rangel*, 328 Or 294, 302-03, 977 P2d 379 (1999). As did we, it also held that *State v. Moyle*, 299 Or 691, 703-05, 705 P2d 740 (1985),

"explains what behavior constitutes a proscribable 'threat' in this context. * * * According to *Moyle*, a proscribable

threat is a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts."

*Rangel*, 328 Or at 303 (citing *Moyle*, 299 Or at 703-05).

Given that understanding of the reach of the stalking statutes, it is evident that defendant did not engage in conduct that could result in the entry of a stalking protective order against him. The first series of telephone calls about which plaintiff complained occurred on March 1, 1999. In the two calls on that day in which defendant spoke, he disguised his voice and twice said that he wanted to engage in some form of sexual activity with plaintiff. Neither of those statements could be understood to constitute an unequivocal threat to go to plaintiff's house within a few minutes of the calls and sexually assault her. Only if the calls had conveyed that or an equivalent idea could they constitute a threat of the kind proscribed by the stalking statutes.[1]

The next, and last, series of calls occurred on May 12, 1999. In the first call in that series, defendant again used a disguised voice and said, "I want some of that little pussy, I'll be right over!" Plaintiff hung up the telephone, and defendant promptly called back. In the second call, the parties engaged in a colloquy in which they asked each other to identify themselves, and defendant explained that he wanted to get an answer to his prior call. The only way to interpret that exchange is that defendant wanted to know if plaintiff had any desire to engage in sexual activity with him.[2] Plaintiff

---

[1] Had defendant made a similar series of calls using a disguised voice in which he said that he wanted plaintiff dead, the calls could well have alarmed plaintiff but they, too, would not constitute threats covered by the stalking statutes. Without more information, there would be no way to know whether the statements were intended as a prank or as a serious statement of defendant's intention toward plaintiff. Even if the latter, the statement could not reasonably be understood to convey an intention to come to plaintiff's house within a very short time to act on the sentiment, which is what the statement would have to convey in order to constitute a proscribable threat under the stalking statutes.

[2] Plaintiff testified as follows about the exchange:

"[PLAINTIFF]: When I picked up the phone he said who is this and I said who is this and he said this is the guy that wants to—then he said what he said and then he says so what's your answer and that's when I hung up and he called back and that's when I—I left the phone off the hook and I was told to use my cell phone to call the police.

again hung up, and when defendant called a third time, plaintiff hung up and then took the telephone off the hook to prevent defendant from calling again.[3]

I think that the three calls that defendant made in quick succession on May 12 should be considered as a whole, given their timing and content. However, even if each call were analyzed separately, it is evident that they do not constitute repeated unequivocal threats by defendant to go to plaintiff's house promptly after making the calls and commit a sexual assault. The first call comes closest to such a threat, in that defendant said that he "wanted" to engage in sexual activity with plaintiff and would be right over. There is no reason to imagine that plaintiff had any desire or intention to engage in sexual activity with defendant, so, if there were to be such activity, it would be nonconsensual and, hence, criminal. However, the words, themselves, do not convey an unequivocal threat to commit a sexual assault.[4]

---

"THE COURT: Okay, and what did you take that to mean, I want an answer?

"[PLAINTIFF]: He wanted—he wants to know if I'm going to let him do that to me I guess. I don't know.

"THE COURT: Okay.

"[PLAINTIFF]: I don't know exactly what he meant by that but that's what he said."

[3] I have stated the evidence in the light most favorable to plaintiff's claim. It may be that all of the calls that occurred on May 12 included the idea that defendant wanted an answer to his inquiry, but the testimony in the record is confusing enough to make it unclear whether defendant first made the statement requesting an answer in the second call that day.

[4] Even if the words, in context, conveyed such a threat, plaintiff acknowledged in her testimony that she did not know where they came from, so she did not know whether the caller was in a position to act on them. She testified in response to a question from the court about how she felt after the calls on May 12:

"[PLAINTIFF]: Scared, really scared. I didn't know where they were coming from, I didn't know if he—if it was somebody [who] could be watching me right then or if it was somebody just messing around. I didn't know.

"THE COURT: Okay, were you afraid for danger of your —[.]

"[PLAINTIFF]: Yeah because the way that he talked it could have sounded like if he was watching me he could come over and me being home alone in the morning I didn't know what to do so I wanted to get out of the house as fast as I could because I didn't know."

Although the timing of the calls reasonably could lead plaintiff to suspect that they were made by someone who was near her house, she had no way of knowing that, so she could not know if defendant was in a position to act on any threat to assault plaintiff sexually, if his statement otherwise communicated such a threat.

In the second call, defendant included the statement in which he said that he wanted an answer to his earlier call in which, before plaintiff hung up the telephone, defendant had said that he wanted to engage in sex with plaintiff and would be right over. The second call indicates a desire by defendant to know whether plaintiff had any interest in his proposed course of conduct. That statement undercuts any suggestion that defendant's prior call constituted a threat to commit a sexual assault and precludes an understanding that the second call conveyed such a threat. Nothing suggests that the third call in the series of calls for that day added anything further to the exchange. Consequently, at most, only one of the calls that defendant made on May 12 could be understood to constitute a threat by defendant to go promptly to plaintiff's house and sexually assault her. Because the stalking statute requires that a defendant engage in repeated violations of it in order to be subject to a stalking protective order, the single call on May 12 in which defendant may have made a proscribable threat is insufficient to establish a basis on which the court could enter a stalking protective order against defendant. Consequently, I must respectfully dissent from the majority's contrary conclusion.

I should add, however, that, I am confident that the stalking statutes could be amended to cover defendant's telephone calls to plaintiff. As noted earlier, the legislature enacted ORS 166.090 to address calls of the kind that defendant made to plaintiff. Because the legislature can make it a crime to make those calls, I believe that it could incorporate that conduct into the stalking statutes. The problem is that the legislature has not yet done that.