Argued and submitted December 15, 1998, vacated in part and reversed in part on
appeal; affirmed on cross-appeal August 4, 1999

# PORTLAND GENERAL ELECTRIC COMPANY,
an Oregon corporation,
*Respondent - Cross-Appellant,*

*v.*

# DUNCAN, WEINBERG, MILLER & PEMBROKE, P.C.,
S. Bradley Van Cleve and Melinda J. Horgan,
*Appellants - Cross-Respondents.*

(9708-06492; CA A100072)

986 P2d 35

James N. Westwood argued the cause for appellants - cross-respondents. With him on the briefs was Miller, Nash, Wiener, Hager & Carlsen LLP.

Barbee B. Lyon argued the cause for respondent - cross-appellant. With him on the briefs was Tonkon Torp LLP.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, S. J.*

_____

\* Retired February 28, 1999.

On appeal, paragraph 1 of judgment vacated; paragraphs 2(a), (b), and (f) of judgment reversed; post-trial order reversed; otherwise affirmed. Affirmed on cross-appeal.

**WARREN, S. J.**

Defendants Melinda Horgan and Bradley Van Cleve,[1] two attorneys who were formerly employees of plaintiff Portland General Electric (PGE), appeal from an injunction that prohibits them from representing Industrial Customers of Northwest Utilities (ICNU), a nonprofit association of large industrial consumers of utility services, in various proceedings before the Oregon Public Utilities Commission (PUC) to which PGE is a party. PGE asserts that Horgan and Van Cleve have both matter-specific and information-specific conflicts arising from their former representation of PGE and that those conflicts make their representation of ICNU a violation of their obligations under DR 5-105(C). In addition, PGE cross-appeals from the trial court's refusal to extend the injunction to include defendant Duncan, Weinberg, Miller & Pembroke, P.C., the Washington, D.C. law firm in whose Portland office Horgan and Van Cleve are employed. The court instead required Duncan Weinberg to strengthen the "Chinese wall"[2] between its Portland and Washington offices on matters on which Horgan and Van Cleve were disqualified. On *de novo* review we modify the injunction on appeal and affirm on cross-appeal.

Horgan worked for PGE for approximately two years, ending in January 1996 when she left to open the Portland office of Duncan Weinberg; she had previously been an associate in that firm's Washington office. During her tenure at PGE, her work primarily involved regulatory matters, including playing a leading role in representing PGE before the PUC in two proceedings, UE 88,[3] a general rate case[4] in

---

[1] When we refer to "defendants" without qualification we include all defendants; we will refer to separate defendants by their names.

[2] We agree with PGE that "Chinese wall" is an appropriate term and that it does not have the pejorative connotations that made some expert witnesses uncomfortable in using it. As one of humanity's greatest engineering achievements, the Great Wall of China suggests the kind of solidity and impermeability that a potential conflict of interest situation requires; we have previously referred to it as a generic term for that kind of barrier. *See State v. Soriano*, 68 Or App 642, 664, 684 P2d 1220, *opinion adopted* 298 Or 392, 693 P2d 26 (1984). It is what we mean by our references to a "wall" in the balance of this opinion.

[3] We will refer to the relevant PUC proceedings by their docket numbers before the Commission.

[4] A general rate case involves the examination of a utility's entire rate structure in order to determine what adjustments to the rates are appropriate. Because

which the major issue was the extent to which PGE could include the costs involved in decommissioning the Trojan Nuclear Plant in its rate base,[5] and UE 93, in which the major issue was including the new Coyote Springs natural gas generating plant in PGE's rate base. As an attorney on those cases, Horgan learned a great deal about the nature of PGE's business, its physical plant, and its rate structure and strategy.

Van Cleve worked for PGE for about 10 years, beginning while he was still in law school. In his last two years his primary focus was on long-term contracts for the purchase and sale of power. As part of that work he became familiar with the nature of PGE's wholesale energy trading operations. He left PGE to become the second attorney in Duncan Weinberg's Portland office about six months after Horgan established it.

The conflicts that PGE alleges that Horgan and Van Cleve have in representing ICNU arise from the relationship between their work for PGE and current and contemplated changes in the nature and structure of the electrical utility industry, including how it is regulated. Until recently, each investor-owned utility[6] has had a monopoly on the sale and distribution of electricity within its assigned geographical area. Each utility's rates have been regulated in an effort to ensure an adequate but not exorbitant return on the utility's investment in generating plants, transmission lines, distribution facilities, and all of the other things that are necessary for it to perform its functions.

The underlying change that appears to be coming is to allow different energy producers and sellers to compete to sell power to customers without regard to where the customer is located. In order to make that possible, a utility will have to "unbundle" its rates, charging separately for each of its services rather than having a single rate that is designed

---

such cases are major undertakings, they usually occur only once every three to five years for a particular utility.

[5] *See Citizens' Utility Board v. PUC*, 154 Or App 702, 962 P2d 744 (1998), *rev allowed* 328 Or 464 (1999).

[6] Publicly owned utilities function in a different way that is not relevant to the issues in this case.

to cover all of its costs in procuring the electricity and delivering it to the customer. After unbundling, a customer would purchase and pay for each unbundled service separately—for instance, paying the existing utility for maintaining the distribution system and paying a different company for the electricity that the utility distributes to the specific customer over that system.[7] In a competitive market, the rates for electricity itself would be unregulated, while those for distribution and transmission might remain regulated; according to PGE, there is little desire to require different companies to string competing power lines down the same streets.

While Horgan and Van Cleve worked for PGE, it established an "Unbundling Task Force" in which PGE and industry representatives discussed some of the issues involved in allowing industrial customers to choose their energy suppliers. ICNU was one of the participants in the task force; both Horgan and Van Cleve attended one or more meetings on PGE's behalf and had other involvements—the extent of which is disputed—in the issues that the task force considered.

The essential issue that PGE raises in this case is whether Horgan and Van Cleve can represent ICNU in dealing with the change to a competitive retail energy market. At the heart of that issue is the problem of "stranded" or "transition" costs. This is one of the most contentious issues in general and, according to PGE, is something that the Unbundling Task Force considered at length and that otherwise relates directly to Horgan's and Van Cleve's work for PGE. Stranded costs are contentious because they are an inevitable consequence of the change and present a straightforward issue of the extent to which the utilities or their customers will gain or lose from it. As PGE points out, stranded costs represent a zero-sum game: either PGE or its customers will have to pay for them; there is no "win-win" solution.

---

[7] It is, of course, impossible to track the source of the specific electricity that reaches each customer; rather, each generating company will provide the distributing utility enough energy in total to meet the demand of that generating company's customers.

Stranded costs arise from the differences between the monopoly and competitive environments.[8] When a regulated public utility reasonably and prudently builds a generating facility, it is entitled to add that facility to its rate base. The utility's future rates will then include an amount that is intended to amortize the cost of the facility over the facility's anticipated useful life. For example, appropriate amortization for a $300 million facility might require allowing the utility to receive 5 cents per kilowatt hour for the facility's output over a 30-year useful life. The fact that the utility is a monopoly ensures that it will actually receive that amount; the purpose of public regulation is to ensure both that the utility receives a reasonable return and that it does not use its monopoly power to extort more than is reasonable. Stranded costs would arise in this example if, at the end of 20 years, when it has amortized $200 million of the facility's cost but still has $100 million to go, the utility ceases to have a monopoly on electricity. It will then have to sell the facility's power for whatever the market will bring. If the market rate is 5 cents or more, the utility will be able to continue the amortization as it originally anticipated. If, however, the market rate is less than 5 cents, the utility will be unable to complete the amortization; the difference between the amount of the investment that the utility will be able to recover and the amount that it would have been able to recover as a regulated monopoly is "stranded," with nowhere to go. That amount can also be seen as a cost of the transition from regulation to competition.[9]

Because the regulated environment both insulated utilities from market conditions and prevented them from taking advantage of their monopoly position to charge rates that would have allowed them to amortize their facilities

---

[8] We found PGE's explanation of stranded costs in its brief to be quite helpful and rely on it for this discussion. In doing so, we attempt to simplify it even more than PGE has already done without distorting the basic concept.

[9] The same situation can arise with a contract to purchase or sell power at wholesale. The contract may require the utility to purchase power at wholesale at greater than the market rate or to sell it at less than that amount. If the contract is reasonable and prudent, a regulated utility will be able to charge customers an amount that will cover the contract cost but no more. An unregulated utility, however, will sell to customers at the market rate, and the difference between the contract and market wholesale prices can then be seen as a stranded or transition cost.

more rapidly, there is a general understanding that they will be entitled to recover their legitimate stranded costs in some way. The extent of stranded costs and the precise method for recovering them are matters of considerable contention between utilities and their various customers and will be a major issue before the PUC. Among other things, utility customers assert that the regulated price for some facilities is less than the market price, giving the utility a benefit if it is able to charge the higher market price. PGE's customers argue that that possibility is especially significant in the Pacific Northwest, where electric prices have traditionally been much lower than those in the rest of the nation. During the meetings of the Unbundling Task Force, an ICNU economist argued that PGE's net stranded costs are zero or even less. PGE, on the other hand, insists that they are close to $1 billion. By far the largest single stranded cost, according to PGE, is the Trojan plant.

In June 1996, shortly after Van Cleve left to join Horgan in Duncan Weinberg's Portland office, PGE circulated a tariff, known as Schedule 77, to ICNU and others to provide some of the details of a proposed limited test of open access to power among its industrial customers. In Schedule 77, PGE set out the rates that it believed it should receive for its services for distributing electricity that those customers would purchase elsewhere; those rates included amounts to cover PGE's asserted stranded costs. According to PGE, a revised version of Schedule 77 became part of the Customer Choice Plan that we discuss below.

PGE argues that both Horgan and Van Cleve were deeply involved in issues involving stranded costs, Horgan through her work on the rate case involving Trojan and Van Cleve because of his knowledge of many of its wholesale power contracts, which are also potential stranded costs. That is the foundation of PGE's belief that they have a conflict of interest in representing ICNU against PGE.

Shortly after PGE circulated Schedule 77, Enron, a large energy company that is based outside of Oregon, announced that it intended to acquire PGE in a friendly merger. Enron then filed a proceeding with the PUC, docket number UM 814, seeking permission for the merger. ICNU

intervened in that proceeding, with Horgan and Van Cleve representing it.[10] PGE then asserted that their representation violated the conflict of interest prohibitions in DR 5-105. Horgan and Van Cleve, relying in part on their understanding of discussions that Horgan had with disciplinary attorneys with the Oregon State Bar, denied that there was any conflict. After some negotiations, in mid-October 1996 PGE, on the one hand, and Horgan, Van Cleve, and Duncan Weinberg, on the other, signed a written Agreement[11] describing conditions under which Duncan Weinberg could represent PGE.

The Agreement first provided that the Washington office of Duncan Weinberg could represent ICNU with regard to PGE's 1997-98 rate plan and Schedule 77 and that the firm would erect a wall between the Portland and Washington offices with respect to those matters. The Portland office, including Horgan and Van Cleve, however, could represent ICNU in proceedings involving the Enron merger, provided that it did not advise ICNU on issues significantly related to Trojan cost recovery, stranded cost issues significantly related to Schedule 77, or issues involving PGE-specific facts affecting stranded costs arising from any PGE generating unit that was in PGE's rate base as of July 1, 1996.[12] The Portland office could advise ICNU on more general issues involving stranded cost policy. It could not, however, advise ICNU on any matter that would require disclosing confidences or secrets related to PGE's power marketing operations or on any rate issue that was significantly related to a rate matter on which Horgan or Van Cleve had previously represented PGE.

---

[10] PGE does not assert that either Horgan or Van Cleve knew anything about the possibility of a merger with Enron while working at PGE.

[11] At trial all parties and the court referred to the Agreement as the "Waiver Agreement." On appeal, in part because of the use that defendants made of the term in their opening brief, PGE disputes that description, preferring simply to call it the "Agreement." Because that is how the Agreement is captioned, we will give it that designation without necessarily agreeing with PGE's description of its nature or effect.

[12] There would also be a wall between the Portland and Washington offices on the merger, which would permit the Washington office to take over representation of ICNU if the Portland office had to withdraw.

Pursuant to the Agreement, Horgan and Van Cleve represented ICNU before the PUC in the Enron merger proceedings, playing a significant role in PGE's ultimate agreement to make a substantial merger-related reduction in its rates.[13] On June 4, 1997, the PUC entered an order approving the merger. As part of that order, it adopted a stipulation among the parties to the merger proceeding, including PGE, that imposed a number of conditions on the approval. The last, condition 22, required PGE, within 60 days of the closing of the merger, to propose a plan that included: (1) proposed terms and conditions on which all customer classes would have the opportunity to choose electricity providers; (2) a proposed separation of the competitive from the monopoly businesses of PGE; and (3) a proposed resolution on recovery of stranded costs. On August 1, 1997, PGE filed a proposed Pilot Program (docket number UE 101) that would permit customers in several selected communities to choose among a number of suppliers of electricity. According to PGE, the tariff for industrial customers under that program came from the same discussions that had led to Schedule 77.

On September 2, 1997, in compliance with condition 22, PGE filed its proposed Customer Choice Plan (docket number UE 102).[14] In that plan, PGE did not simply propose to unbundle its rates. Rather, the plan contemplated a complete disaggregation of PGE into several separate companies. As part of that disaggregation, the plan provided for PGE's customers to pay the full amount of its stranded costs through higher rates for the use of the distribution system that would remain with a regulated company.

In late 1996 and early 1997, the PUC initiated two "generic" proceedings concerning the ways in which it should resolve certain issues that were likely to arise from partial deregulation. Neither proceeding arose from or was otherwise related to any specific proposal from any utility; rather, each provided a forum in which all interested parties could

---

[13] James Pembroke of Duncan Weinberg's Washington office handled the matters on which the Agreement permitted that office to represent ICNU.

[14] The parties refer to this filing variously as Condition 22, the 60-day filing, and Customer Choice (capitalized to distinguish it from the general concept of customer choice). We will generally refer to it as the *Customer Choice Plan*.

participate as the PUC set broad policies that it would then apply to a wide variety of future proposals. Those generic proceedings were UM 827, which involved methods for estimating electric utilities' marginal costs, and UM 834, which involved methods for handling transition (stranded) costs. Horgan and Van Cleve represented ICNU in both of those generic proceedings; to the extent that either proceeding might involve a conflict with their previous representation of PGE, they relied on the Agreement as resolving the conflict.

Shortly before PGE filed the Pilot Program, PGE came to believe that Horgan and Van Cleve also intended to represent ICNU with regard to both the Pilot Program and the Customer Choice Plan.[15] PGE believed that that representation would involve potential conflicts of interest that the Agreement did not cover and filed this action on August 18, 1997, seeking to disqualify them from representing ICNU in those proceedings. Shortly thereafter, PGE sought a preliminary injunction prohibiting defendants from representing ICNU in the Pilot Program, the Customer Choice Plan, or any other proceeding related to the disaggregation of PGE; the last provision expanded the case beyond the issues in the original complaint. A hearing on the preliminary injunction began soon afterwards; during the proceedings the parties agreed to convert it to a trial on PGE's claim for a permanent injunction.

After the hearing, the trial court concluded that Horgan and Van Cleve could not represent ICNU on any matter related to the merger with Enron. It first "relieved" the parties from the benefits and obligations of the Agreement, declaring that it was now "void," apparently on the ground that it had proved to be unworkable as a result of the issues that arose from the Enron merger. It then concluded that *"all* matters relating to or arising from the Enron merger" involved matter-specific conflicts and that some involved information-specific conflicts. It based that conclusion on its finding that all of the work would involve stranded

---

[15] PGE states that Horgan and Van Cleve told one of its employees that that was their intent; Horgan and Van Cleve deny that they stated that they intended to represent ICNU on the Pilot Program. The notes that the PGE employee made of the conversation do not resolve that conflict.

costs relating to the generating facilities and power contracts on which Horgan and Van Cleve had worked while they were with PGE. It also concluded that the Pilot Program, the Customer Choice Plan, and all general rate cases that were to be filed within three years of the merger were significantly related to the merger and thus were matters on which Horgan and Van Cleve had conflicts. Based on those conclusions, the court entered a judgment permanently enjoining Horgan and Van Cleve from representing ICNU with respect to

"(a) matters which relate to the disaggregation of PGE; (b) matters which arise from the merger of Enron and Portland General Corporation; (c) PGE's Customer Choice Plan [the Pilot Program]; (d) PGE's Introductory Customer Choice Plan; (e) PGE's stranded costs relating to the generating facilities and power contracts that defendants Van Cleve and Horgan worked on as lawyers for PGE; and (f) for a period of three years from July 1, 1997, any PGE rate case."

The court permitted the Washington office of Duncan Weinberg to represent ICNU if it first established a wall that met the requirements that the court described in its injunction. The court intended those requirements to resolve inadequacies that, it believed, the evidence showed had existed with the previous wall.

The court did not discuss UM 827 and UM 834, the generic proceedings, in its opinion letter or in its judgment. Horgan and Van Cleve thereafter asked the court to clarify the injunction by ruling that they could continue to represent ICNU in those proceedings. Instead, the court ruled that they could not represent ICNU in UM 834 at all and that they could not represent it in UM 827 until the PUC removed all issues relating to "special contracts" from that docket. Finally, it established conditions that defendants had to follow before they could provide their files to any new counsel for ICNU. This appeal and cross-appeal followed.

PGE bases its arguments on the provisions of the attorney discipline rules; defendants in response also rely on those rules. We first consider the extent to which the trial court has authority to act in light of the Supreme Court's

exclusive jurisdiction over attorney discipline. The trial court's authority is based on fiduciary duties that attorneys have to their clients independently of the rules; most of those duties existed long before the rules existed. Because those duties may involve some things that the rules also cover, and because issues most often arise in the course of disciplinary proceedings, it may be convenient to refer to the rules and cases decided under them to assist in understanding what those duties are. However, the trial court and we are enforcing those fiduciary duties, not the disciplinary rules.

In *State ex rel Bryant v. Ellis*, 301 Or 633, 724 P2d 811 (1986), one of several defendants in a civil case moved to disqualify a lawyer for the other defendants on the ground that the lawyer had a conflict of interest. The lawyer represented a group of California partnerships in which all of the defendants were involved; the other defendants in the Oregon case asserted that only the single defendant was liable for the claim asserted in that case. The trial court held that it was without authority to consider the motion, and the single defendant then brought this mandamus proceeding. The Supreme Court noted that the disciplinary rules have the status of law and that it is the only court involved in the enforcement of attorney discipline. It pointed out, however, that that

> "does not mean that conduct proscribed by a rule of professional conduct, such as one of the Disciplinary Rules, may not also violate a civil obligation of a member of the profession to another person. On the contrary, such rules ordinarily are designed to protect clients, patients, or other persons against the consequences of a misplaced trust in the professional's sense of responsibility and probity." 301 Or at 636.

The court pointed out that circuit courts have jurisdiction to try damage claims for professional negligence even though neglecting or acting incompetently in a legal matter may be a disciplinary violation. It did not know of any reason that the trial court's jurisdiction should not also extend to equitable remedies; indeed, no other court appeared to have original jurisdiction to grant injunctive relief. *Id.* at 637.

■ Many duties of professional persons exist independently of special disciplinary codes; "courts know the duties of

lawyers as members of the same profession even though only this court administers the Code of Professional Responsibility." A trial court, thus, may hold a lawyer to some fiduciary or other duty that is also covered by the disciplinary rules, if the question arises in an appropriate setting. *Id.* at 638. That appropriate setting does not require that there be any pending litigation; a threat that an attorney will violate a fiduciary duty may in itself be sufficient to support an independent equitable action to require compliance with that duty. *See id.* at 639.

■ In a later case involving an attorney's right to fees for representing the personal representative of an estate when the attorney also represented the estate's primary beneficiary, the Supreme Court emphasized that courts recognized that representing clients with conflicting interests was improper long before the existence of the disciplinary rules. Denial or reduction of fees has been a consequence of a conflict of interest for many years. That denial or reduction, however, would be the result of a breach of fiduciary duty, not of a violation of the disciplinary rules; it is comparable to denying fees to a (nonlawyer) trustee because of the trustee's breach of duty in administering the trust. For a lawyer, the disciplinary rules may help in establishing a standard of conduct, but a reduction or denial of fees for violating that standard would not be a sanction for violating the disciplinary rules. Only the Supreme Court has the authority to enforce the rules. *Kidney Association of Oregon v. Ferguson,* 315 Or 135, 142-44, 843 P2d 442 (1992).

Those cases show that the trial court's authority to entertain this action comes from its general equitable authority to enjoin a threatened breach of fiduciary duty; despite the reliance that the trial court and the parties placed on the disciplinary rules, those rules are relevant only to the extent that they tend to show the scope of Horgan's and Van Cleve's fiduciary duties to PGE. The fact that the court is enforcing a fiduciary duty rather than a disciplinary rule means, among other things, that the rules do not necessarily establish the scope of the duties that the court enforces. Those fiduciary duties may go beyond the requirements of the rules; on the other hand, the duties may not include all of the intricacies of the rules.

The parties and the trial court assumed that DR 5-105(C) states the current understanding of a lawyer's fiduciary duty to avoid representing a present client whose interests conflict with those of a previous client (a "closed file" conflict). In the absence of any argument that a lawyer's fiduciary duty is different from the requirements of the rule, we will also treat it as setting the applicable standard. The rule provides:

> "Except as permitted by DR 5-105(D), a lawyer who has represented a client in a matter shall not subsequently represent another client in the same or a significantly related matter when the interests of the current and former clients are in actual or likely conflict. Matters are significantly related if either:
>
> "(1) Representation of the present client in the subsequent matter would, or would likely, inflict injury or damage upon the former client in connection with any proceeding, claim, controversy, transaction, investigation, charge, accusation, arrest or other particular matter in which the lawyer previously represented the former client; or
>
> "(2) Representation of the former client provided the lawyer with confidences or secrets as defined in DR 4-101(A), the use of which would, or would likely, inflict injury or damage upon the former client in the course of the subsequent matter."

Those provisions generally codify the Supreme Court's discussion of former client conflicts in *In re Brandsness*, 299 Or 420, 702 P2d 1098 (1985). The conflicts described in subsection (1) are known as "matter-specific" conflicts; those described in subsection (2) are "information-specific" conflicts. PGE alleged that Horgan and Van Cleve had both kinds of conflicts in representing ICNU.

■ We turn to Horgan's and Van Cleve's assignments of error. They first assert that the trial court erred in refusing to defer to what they state is the PUC's primary jurisdiction over the case. They argue that the law of conflicts of interest is relatively simple but that applying it to the specific context of the utility regulatory process is factually complex and

peculiarly within the PUC's area of expertise.[16] They point out that OAR 860-012-0005 requires all persons appearing before the PUC in a representative capacity to conform to the ethical standards required of Oregon attorneys and permits the PUC to decline to permit a person who fails to do so to appear. According to the evidence, although the PUC commissioners are not themselves lawyers, an administrative law judge, who is a lawyer, would frame the issues by establishing the criteria for what is "significantly related," and the commissioners would then apply their expertise to determine the extent to which the various proceedings were significantly related.

■　　Primary jurisdiction, as it may apply in this case, is a court-made doctrine by which a court determines whether and when to defer exercising its jurisdiction in order that some agency may first decide some question presented. *See Reinwald v. Dept. of Employment,* 148 Or App 75, 81, 939 P2d 86 (1997); *Perla Development Co. v. Pacificorp,* 82 Or App 50, 53 n 1, 727 P2d 149 (1986), *rev den* 303 Or 74 (1987). In *Boise Cascade Corp. v. Board of Forestry (S42159),* 325 Or 185, 935 P2d 411 (1997), the Supreme Court stated three criteria for determining whether an agency has primary jurisdiction over an entire dispute or a specific issue raised in a dispute: (1) the extent to which the agency's expertise makes it the preferable forum; (2) the need for uniform resolution of the issue; and (3) the potential that judicial resolution of the issue will have an adverse effect on the agency's responsibilities. *Id.* at 192. Defendants argue that the essential issue in the case is the extent to which their representation of ICNU before the PUC is the same matter as Horgan's and Van Cleve's previous representation of PGE before that body. That, they say, is something that is peculiarly within the PUC's expertise, as shown in part by the trial court's failure to understand the relationship of the various PUC proceedings to each other. They recognize, as did the trial court, that the other two criteria are less significant.

---

[16] A week after PGE filed this case, defendants filed a motion with the PUC to qualify them as counsel in the (at that time unfiled) Customer Choice Plan proceeding. The PUC deferred acting on that motion pending the outcome of this case.

The basic problem with defendants' argument is that the underlying issue in this case is not utility regulation but the relationship between two attorneys and their former client. The PUC's primary role is to regulate the conduct of utilities; regulating the conduct of those who appear before it is incidental to that primary function. On the other hand, a court of equity is a traditional forum to enforce one person's fiduciary duties to another. Although the focus of PGE's complaint was on defendants' representation of ICNU before the PUC, the issues that it raised could potentially arise in other contexts, including proceedings before the Federal Energy Regulatory Commission, legislative lobbying, or simply providing advice to a client, and they could arise with regard to clients other than ICNU. The course of this case shows the importance of keeping the issues in a judicial forum.

In its original complaint PGE sought only to prevent defendants from representing ICNU in the Pilot Program and the Customer Choice Program. When it moved for a preliminary injunction a few days later, it broadened its claims to cover all proceedings involving the disaggregation of PGE. So long as the trial court retained jurisdiction it was possible to expand the case to cover other new issues that did not involve PUC proceedings; that is not something that could occur if the PUC had primary jurisdiction. The trial court, thus, could give complete relief, which the PUC could not. That reflects the authority of a court of equity to enforce Horgan's and Van Cleve's fiduciary duties to PGE to their full extent, not simply to resolve specific disputes. The trial court did not err in refusing to refer the issues to the PUC.

Defendants next assign as error the trial court's decision to declare the Agreement to be void as of the date of the court's decision. Neither party had asked for, or even suggested the possibility of, that action. Neither party fully agrees with the reasoning that led the trial court to that decision. For defendants, this is the most important issue in the case. They believe that the Agreement expressly permits them to do what the trial court prohibited them from doing. In their view, if we hold that the trial court should not have invalidated the Agreement but accept the rest of the trial court's reasoning, then we must reverse its decision. In response, PGE argues that the Agreement is irrelevant,

because the trial court's conclusion that all matters relating to the disaggregation of PGE are related to the Enron merger is incorrect. In its view the Agreement does not apply to anything involved in this case. We generally agree with PGE on that point.

In determining what were matter-specific conflicts, the trial court apparently treated the issue of stranded costs relating to the generating facilities and power conflicts on which Horgan and Van Cleve worked as the essential "matter" that might lead to conflicts. Starting from that point, it then held that all of the proceedings relating to or arising from the Enron merger involve matter-specific conflicts, because those proceedings will inevitably involve the matter of stranded costs. It also concluded that all general rate cases filed within three years of the merger, as well as the Pilot Program and the Customer Choice Plan, significantly relate both to Horgan's and Van Cleve's work on stranded costs and to the Enron merger.[17]

Defendants agree with much of the trial court's reasoning, including that stranded cost issues are the same matter as the Enron merger. They argue that, because the Agreement expressly permits Horgan and Van Cleve to represent ICNU in the merger, the Agreement also permits them to represent ICNU on all of the matters that the trial court described. From defendants' perspective, if the Agreement is still in effect, there is no support for most if not all of the injunction or for the court's subsequent prohibition on representing ICNU in UM 827 and UM 834. We conclude that the continued validity of the Agreement is irrelevant to this case, because it would not authorize Horgan and Van Cleve to represent ICNU in any of the matters at issue.

The first two provisions in the Agreement do not authorize Horgan and Van Cleve to do anything. Rather, those provisions prohibit them from representing ICNU with respect to PGE's 1997-98 Rate Plan or Schedule 77. The crucial provision, thus, is the third, which authorizes them to

---

[17] An interesting aspect of the trial court's decision is that it appears to have used the Enron merger as the base point for determining matter-specific conflicts, even though Horgan and Van Cleve represented *ICNU*, not *PGE*, in the merger proceedings.

represent ICNU "in proceedings involving the PGC/Enron merger," with exceptions that include issues "significantly related to Trojan cost recovery," stranded cost issues "significantly related to Schedule 77," and issues involving the disclosure of confidences or secrets related to PGE's power marketing operations or previous rate cases on which Horgan or Van Cleve had worked. The trial court did not rely on the exceptions, because it concluded that all of the things described in the injunction were the same matter as the Enron merger, a conclusion that it subsequently extended to UM 827 and UM 834.

The trial court's reasoning, thus, appears to be: (1) Horgan and Van Cleve worked on issues involving stranded costs while they were at PGE; (2) the issues in the Enron merger include stranded costs; (3) the Enron merger is therefore the same matter as stranded costs; (4) anything that has its origins in the Enron merger is the same matter as the merger; (5) condition 22 to the merger required PGE to file what it designated as the Consumer Choice Plan; (6) the Consumer Choice Plan was the first movement toward complete disaggregation of PGE; (7) anything that may flow from condition 22, including all issues related to disaggregation, are part of the same matter as the merger; (8) Horgan and Van Cleve are disqualified from representing ICNU on any matter relating to the disaggregation of PGE. That reasoning is based on far too broad a definition of the same matter.

 DR 5-105(C)(1), which governs matter-specific conflicts, prohibits representation of the new client in the same "proceeding, claim, controversy, transaction, investigation, charge, accusation, arrest or other *particular* matter" (emphasis added) in which the lawyer represented the former client. Each of the words in the rule refers to some defined incident, legal proceeding, or transaction. Although "claim" and "transaction" may now have broader meanings than they did 50 years ago, *see Lee v. Mitchell*, 152 Or App 159, 165-66, 953 P2d 414 (1998), they still require a connected set of operative facts that are related in time and space. *Id.* at 170. In the same way, a "proceeding" generally refers to a specific administrative or judicial action. *See OR-OSHA v. Eslinger Logging, Inc.*, 156 Or App 519, 526-28, 967 P2d 889 (1998), *rev den* 328 Or 418 (1999). Thus, although

several things may well be part of the same matter if they arise from the same proceeding or factual circumstances, there is nothing in any of the terms used in the rule to suggest that two things are the same matter simply because they involve the same subject or information. The fact that one matter may have its genesis in another matter (as the Customer Choice Plan may have had its genesis in condition 22) does not mean that the two are simply aspects of the same matter.

The Supreme Court has decided several disciplinary cases that give examples of what constitutes the same matter under the rules. In *Brandsness*, the source of the distinction between matter-specific and information-specific closed file conflicts, the attorney represented both the husband and the wife in acquiring a business and in preparing mutual wills. The attorney subsequently represented the husband in dissolution proceedings, including filing for a temporary restraining order to exclude the wife from involvement in the business. The Supreme Court held that the execution of the will did not create a conflict with the subsequent dissolution. However, the attorney had a matter-specific conflict when he represented the husband in his attempt to keep control of the business in the dissolution proceeding after having represented both the husband and the wife in the purchase of the business. In each action the matter involved was the ownership and control of the business.

In *In re McKee*, 316 Or 114, 849 P2d 509 (1993), the attorney represented both parties to a divorce and subsequently represented the husband in seeking to remove the wife's lien from the house that the husband received in the property settlement. Those actions involved a matter-specific conflict. In *In re Trukositz*, 312 Or 621, 825 P2d 1369 (1992), the attorney represented both the husband and wife in establishing the husband as the natural father of the wife's child. He thereafter represented the husband in a dissolution proceeding in which the issues included child custody, support, and whether the husband was in fact the natural father.

In each of these cases, the core thing sought in the first matter, where the lawyer represented both parties, was

at the heart of the lawyer's representation in the second matter, where he represented one party against the other. Thus, they were the same matter although the proceedings were different. In contrast, in this case the core thing sought in the Enron merger proceeding was a determination of whether the merger would occur and, if so, on what conditions. Stranded costs may have been one of the issues in, or arising from, that proceeding, but they were not at its heart. The same is true of the matters in which Horgan and Van Cleve represented PGE while they worked for it. Although stranded costs may have been involved as an issue in those matters, at least tangentially, they were not at the heart of any matter itself.

In the same way, stranded costs were an issue for the unbundling task force but the "matter" for that task force was producing what became Schedule 77. The contracts that Van Cleve negotiated may turn out to have stranded costs (or stranded benefits), but the "matter" was developing the terms of the agreement. The Trojan and Coyote Springs plants may also produce stranded costs (or, in the case of Coyote Springs, stranded benefits), but the "matters" on which Horgan represented PGE was the extent to which PGE could include their costs in its rates. In no case were stranded costs, by themselves, a "matter." PGE's argument in this regard, as defendants point out, is really an attempt to create an "issue-specific" category of conflicts that has no foundation in the rules, the Supreme Court's decisions, or the nature of a lawyer's representation of a client. The trial court was incorrect in concluding that Horgan and Van Cleve have matter-specific conflicts whenever the issue of stranded costs is involved.

The trial court, thus, was incorrect when it concluded that all previous matters that involved stranded costs are the same matter as the Enron merger and that every post-merger matter that involves stranded costs or some issue arising from the merger proceeding is also the same matter as the merger. Our holding means, on the one hand, that the ground on which the trial court determined that Horgan and Van Cleve had matter-specific conflicts as to each of the matters that it described in the injunction was

incorrect. On the other hand, it also means that the Agreement does not authorize Horgan and Van Cleve to represent ICNU on any of those matters, because none of them is the same matter as the Enron merger. Whether or not the Agreement is still in effect, in short, does not affect the issues in this case. For that reason, we vacate paragraph 1 of the judgment, which provides "[t]he October 1996 Waiver Agreement among the parties is void as of October 3, 1997[.]"

■ The next question is the extent to which Horgan and Van Cleve had information-specific conflicts that would prevent them from representing ICNU in any of the matters at issue in this case. Each of them undoubtedly received many confidences and learned many secrets while working for PGE; the ones that appear to concern PGE the most are those related to stranded costs. In paragraph 2(e) of the judgment, the trial court enjoined them from representing ICNU with respect to "PGE's stranded costs relating to the generating facilities and power contracts that defendants Van Cleve and Horgan worked on as lawyers for PGE[.]" Defendants do not challenge that specific provision on appeal, and we find it to be appropriate.

Paragraph 2(e) of the judgment is similar to the provision in the Agreement that Horgan and Van Cleve would not advise ICNU on stranded cost issues "significantly related to Schedule 77" or "on issues involving PGE-specific facts" affecting stranded costs that PGE seeks to recover based on the costs of any PGE generating unit that was included in PGE's retail sales as of July 1, 1996. The Agreement did permit them to advise ICNU on the "mechanism, method and timeframe" for recovery of stranded costs and on "policy issues related to the general appropriate level of stranded cost recovery that should be recoverable" and on PGE-specific costs that arose after July 1, 1996. Although we do not need to decide whether the Agreement remains in effect, that provision balances Horgan's and Van Cleve's various responsibilities in a way that is consistent with paragraph 2(e) of the judgment.

PGE, however, apparently wants to go beyond the judgment and to exclude Horgan and Van Cleve from any discussion of stranded costs when PGE is a possible subject of

the discussion. It asserts that they learned confidences or secrets that would prevent them from participating in any of the matters described in the rest of the judgment. The difficulty with PGE's argument is that PGE does not identify any specific confidence or secret other than the general issue of stranded costs. In his deposition, PGE's general counsel expressly refused to disclose such things, even *in camera*, for the trial court to evaluate them. PGE, that is, appears to treat stranded costs as an issue-specific conflict, something that, as we have noted, does not exist, rather than as an information-specific conflict. We believe that section 2(e) of the judgment, interpreted as we have described, is sufficient to protect PGE from Horgan's and Van Cleve's improper use of any confidences or secrets relating to stranded costs. The record is insufficient for us to impose any greater restriction. That does not, of course, affect Horgan's and Van Cleve's continuing duty to protect every confidence or secret of PGE that they learned while working for it.

■ We turn to the remaining provisions of paragraph 2 of the judgment. The court first prohibited Horgan and Van Cleve from representing ICNU in "(a) matters which relate to the disaggregation of PGE; (b) matters which arise from the merger of Enron and Portland General Corporation[.]" Neither of those things involves a matter-specific conflict under the criteria that we discussed. The disaggregation of PGE is a large topic with many possible ramifications that may involve a number of specific proceedings; the Customer Choice Plan appears to have been only the opening act. It is certainly not the same matter as anything in which Horgan or Van Cleve participated while working for PGE. It is questionable whether any future matters will rise from the Enron merger, but any that do are unlikely to be the same matter as the merger itself and are even less likely to be the same matter as anything that Horgan and Van Cleve did before they left PGE. To the degree that this prohibition is not moot, it has nothing to do with matter-specific conflicts.

We also do not find any information-specific conflicts that necessarily prevent Horgan and Van Cleve from representing ICNU in matters that relate to the disaggregation of PGE or matters arising from the Enron merger. Paragraph 2(e) of the judgment, as interpreted in light of paragraph 3(b)

of the Agreement, permits advice on the "mechanism, method and timeframe" for the recovery of PGE's stranded costs and on the "general appropriate level of stranded cost recovery that should be recoverable[.]" Those are general matters that do not necessarily involve the disclosure of confidences or secrets. To the extent that Horgan and Van Cleve can represent ICNU on them without such disclosures, there is no information-specific conflict; to the extent that they cannot, the judgment as we have construed it does not permit representation.

Paragraph 2 next prohibits representation of ICNU in "(c) PGE's Customer Choice Plan; (d) PGE's Introductory Customer Choice Plan [the Pilot Program][.]" Horgan and Van Cleve did not work on the Pilot Program, at least in part because of its connection to Schedule 77, on which they had at least some passing involvement while they were at PGE. It is not clear that they challenge that portion of the injunction; if they do, then the prohibition is sustainable, at least as an information-specific conflict and possibly as a matter-specific conflict. Defendants suggested at oral argument that the Customer Choice Plan expired on December 31, 1998, and that that portion of the injunction is therefore moot. In any case, Horgan and Van Cleve deny that they worked, or intended to work, on it. We do not modify those portions of the judgment.

The final portion of the judgment in issue on the appeal is paragraph 2(f), which prohibits Horgan and Van Cleve from working on any PGE rate case for a period of three years from July 1, 1997. The trial court based that provision on its belief that any such rate case would be sufficiently connected with the merger that it would be a matter-specific conflict. Because we have rejected the trial court's view of what constitutes a matter-specific conflict, and because it is impossible at this time to determine whether rate cases that are yet to be filed will involve information-specific conflicts, we reverse that prohibition.

We turn to the post-judgment order, in which the trial court construed the judgment to prohibit Horgan and Van Cleve from representing ICNU in UM 827, the generic marginal cost proceeding, until all issues concerning "special contracts" were removed from that proceeding, and UM 834,

the generic transition costs proceeding, without limitation. It saw those proceedings as matter-specific conflicts because they involved stranded costs issues. Defendants suggested at oral argument that those issues may be moot. To the degree that they are not, the trial court was wrong, for the reasons that we previously described, in treating them as matter-specific conflicts. As generic proceedings, each involves overall issues of policy and may never result in specific orders directly affecting PGE or any other company. In addition, we cannot determine, based on this record, that there is an information-specific conflict. We therefore reverse those aspects of the post-judgment order.

■ The final issue in the case is PGE's cross-appeal. PGE attacks paragraph 3 of the judgment, which permits the Washington office of Duncan Weinberg to represent ICNU, provided that it establishes a wall in accordance with the court's conditions and subject to the approval of either the court or the parties' expert witnesses on legal ethics. PGE's concern is that, in its view, the previous wall that the Agreement required defendants to establish proved to be more of a semi-permeable membrane than a wall and that a large amount of improper information passed through it. PGE therefore asserts that there is no certainty that defendants will comply with the court's requirements. We agree with PGE that in several instances defendants were not as meticulous as they could have been in preserving the wall; part of the reason may be that they had no previous experience with such a procedure. However, we also agree with the trial court that no secrets or confidences passed through it. We believe that the conditions that the court imposed, which defendants do not challenge, are appropriate and that defendants are now fully aware of the requirements with which they must comply. We therefore affirm on the cross-appeal.

On appeal, paragraph 1 of judgment vacated; paragraphs 2(a), (b), and (f) of judgment reversed; post-trial order reversed; otherwise affirmed. Affirmed on cross-appeal.

**EDMONDS, P. J.,** concurring.

The majority modifies[1] the injunction entered against defendants by the trial court by reasoning that, "[i]n

---

[1] The majority reverses paragraphs 2(a), (b), and (f) of the trial court's injunction. Paragraph 2(a) of the injunction enjoins defendants from representing Industrial Customers of Northwest Utilities (ICNU) against Portland General Electric

no case were stranded costs by themselves, a 'matter' [within the meaning of Disciplinary Rule 5-105(DR 5-105)]." 162 Or App at 284. I disagree with the majority's reasoning for the reasons that follow.

An overview of the facts of this case is helpful to understanding why "stranded costs" constitute a "particular matter" within the meaning of DR 5-105. "Stranded costs" for the purpose of this case are costs incurred by a utility for the installation or construction of a facility or are embodied in contracts for the wholesale purchase or sale of power that are not recoverable through revenue from customers because of the early retirement of the facility or other regulatory effects. Defendants Horgan and Van Cleve are attorneys who were employed by Portland General Electric (PGE) and who now represent Industrial Customers of Northwest Utilities (ICNU), an association of large industrial consumers of power generated or delivered by PGE. Horgan worked for PGE from 1993 to January 1996. Van Cleve worked for PGE from 1986 to mid-1996. Within a month or two from leaving PGE's employment, Horgan began representing ICNU on matters not related to PGE. When Van Cleve left PGE, he joined Horgan in representing ICNU. Soon thereafter, Enron proposed to merge with PGE, which led to a proceeding before the PUC. ICNU, represented by Van Cleve and Horgan, intervened in the proceeding. PGE objected to Van Cleve's and Horgan's representation, contending that they had a conflict of interest.

While working for PGE, defendants Van Cleve and Horgan were involved in varying degrees in the "Unbundling Task Force," a forum consisting of representatives of PGE and several of its large industrial customers, including ICNU. The task force discussed ways that PGE's customers

(PGE) with respect to "matters which relate to the disaggregation of PGE[.]" Paragraph 2(b) enjoins defendants with respect to "matters which arise from the merger of Enron and Portland General Corporation[.]" Paragraph 2(f) enjoins defendants from representing ICNU "for a period of three years from July 1, 1997, any PGE rate case." The majority opinion leaves in place the trial court's injunction as to paragraph 2(c): "PGE's Customer Choice Plan[,]" paragraph 2(d): "PGE's Introductory Customer Choice Plan[,]" and paragraph 2(e): "PGE's stranded costs relating to the generating facilities and power contracts that defendants Van Cleve and Horgan worked on as lawyers for PGE[.]" The majority holds that the subjects of paragraphs 2(a) and 2(b) do not involve matter-specific conflicts. As to paragraph 2(e), the majority opinion says, "[d]efendants do not challenge that specific provision of appeal, and we find it to be appropriate." 162 Or App at 285.

would gain access to electricity from other providers in the event that the electric power industry was deregulated. One of the issues discussed by the task force was "stranded costs." PGE desired to recover "stranded costs" as part of the cost of delivery of electricity from other providers to its customers. In the discussions in the task force, ICNU opposed PGE's efforts to recover stranded costs. Part of defendants' task was to ascertain how "stranded costs" could be recovered in spite of the opposition of ICNU and its fellow customers. No agreement was ever reached among the parties represented in the task force. However, an experimental plan known as "Schedule 77," that had evolved from the discussions of the task force, was proposed by PGE after Van Cleve left PGE. Schedule 77 provided for the recovery of stranded costs while permitting industrial customers to choose their supplier. When the issue of a conflict of interest of Horgan and Van Cleve representing ICNU arose at the time of the merger, Horgan and Van Cleve agreed that they would not represent ICNU with respect to Schedule 77. For its part, PGE agreed that Horgan and Van Cleve could continue to represent ICNU so long as they did not advise ICNU on stranded cost issues relating to Schedule 77.

The merger agreement was executed in October 1996 and approved in June of 1997 by the PUC while Horgan and Van Cleve continued to represent ICNU. One of the conditions of the merger was Condition 22, a condition that required PGE to file a proposed plan with the PUC regarding the recovery of stranded costs. PGE complied with Condition 22 by filing a plan named "Customer Choice" that identified facilities for which stranded cost recovery may be required, including 37 long-term power agreements with customers. Those agreements included approximately 10 agreements on which Van Cleve had worked while employed by PGE. Also involved in the plan were 14 generating facilities, three of which were ones with which Horgan had been involved. The plan also contained a proposal to "disaggregate" PGE into separate companies, which necessitates dealing with PGE's stranded costs in the process.

Also, a month before PGE filed the Customer Choice Plan, it filed a proposed Pilot Plan with the PUC that was intended to allow ratepayers in several communities to

choose their own electricity providers on a trial basis. Before PGE filed the Pilot Plan and the Customer Choice Plan, Horgan and Van Cleve, according to PGE, informed PGE that they intended to represent ICNU in the pending PUC proceedings regarding the Customer Choice Plan and the Pilot Plan. PGE believes that ICNU is opposed to its proposals regarding stranded costs, and defendants' disclosure of their intention to represent ICNU in future PUC hearings prompted PGE to file this action for an injunction. PGE argues that "stranded costs" are "matters" within the meaning of DR 5-105(C) and that Van Cleve's and Horgan's proposed representation of ICNU falls within the prohibition of DR 5-105.

The rule, DR 5-105, provides, in pertinent part:

"(A) *Conflict of Interest:* A conflict of interest may be actual or likely.

"* * * * *

"(2) A 'likely conflict of interest' exists in all other situations in which the objective personal, business or property interests of the clients are adverse. A 'likely conflict of interest' does not include situations in which the only conflict is of a general economic or business nature.

"* * * * *

"(C) *Former Client Conflicts—Prohibition.* Except as permitted by DR 5-105(D), a lawyer who has represented a client in a matter shall not subsequently represent another client in the same or a significantly related matter when the interests of the current and former clients are in actual or likely conflict. Matters are significantly related if either:

"(1) Representations of the present client in the subsequent matter would, or would likely, inflict injury or damage upon the former client in connection with any proceeding, claim, controversy, transaction, investigation, charge, accusation, arrest or other particular matter in which the lawyer previously represented the former client; or

"(2) Representation of the former client provided the lawyer with confidences or secrets as defined in DR 4-101(A), the use of which would, or would likely, inflict

injury or damage upon the former client in the course of the subsequent matter." (Emphasis in original.)

Under the rule, conflicts of interest are divided into "specific matter" conflicts and "specific information" conflicts. Initially, the parties dispute what constitutes "a particular matter" within the meaning of a "specific matter" conflict under DR 5-105. PGE argues that stranded costs are "a particular matter" within the meaning of the rule and that, because defendants represented PGE regarding stranded costs, they should be enjoined from representing ICNU. Defendants argue that the "particular matters" within the meaning of the rule are the Unbundling Task Force proceedings, Schedule 77, the Enron Merger, the Pilot Plan and the Consumer Choice Plan and that the phrase "other particular matters" in DR 5-105(C)(1) is simply another way of describing a transaction or controversy. It follows, according to their argument, that, because they did not work on the Pilot Plan and the Consumer Choice Plan, there are no "specific matter" conflicts involving proceedings, transactions or controversies. Apparently, the majority adopts defendants' understanding of the rule because it agrees that stranded costs are not "specific matters" within the meaning of the rule. Thus, my dispute with the majority turns on whether "stranded costs" constitute "specific matter" conflicts within the meaning of DR 5-105.

Under the rule, a "significantly related" matter that gives rise to a likely conflict of interest and prohibits legal representation includes a "particular matter." DR 5-105-(C)(1) provides that a conflict with a former client exists if representation of the present client would likely inflict injury or damage upon the former client "in connection with any proceeding, * * *, controversy, transaction, * * * or *other particular matter* in which the lawyer previously represented the former client[.]" (Emphasis supplied.) The key word in resolving the issue in this case is the word "other" in the phrase "other particular matter." The rule distinguishes between a "proceeding," a "controversy," a "transaction" and *"other particular* matter[s]." (Emphasis added.) The clear implication of the language in the rule is that the phrase "other particular matter" means something different from

the words "proceeding," "controversy" and "transaction," contrary to defendants' suggestion. It is clear from the breadth of the inclusory language in the rule that the rule prohibits the parsing of subjects from the scope of the rule based on semantical distinctions and that it is intended to reach to matters which may not be readily identifiable as proceedings, controversies or transactions. It follows that the transactions, proceedings or controversies in which the lawyer represented the former client need not be identical to the transactions, proceedings or controversies in which the lawyer represents the present client to create a conflict of interest under the rule. Representation is prohibited by the rule if the representation involves particular matters that are significantly related even though separate transactions, proceedings or controversies are involved.

Under the rule, a "significantly related" matter could be specific information consisting of a client confidence or secret, or it could be a "particular matter" on which the attorney has worked for the former client. An example of the latter is where an attorney represented a former client and his wife in the acquisition of their business and served as corporate counsel for the ongoing business, meeting occasionally with the husband to provide legal advice for the business. He then represented the husband in a dissolution of marriage proceeding that involved the business. That representation led to a disciplinary complaint filed by the Oregon State Bar. *See In re Brandsness*, 299 Or 420, 702 P2d 1098 (1985). The representation of the ongoing business did not involve representation in a "proceeding," "transaction" or "controversy." Rather, the business was a "particular matter" within the meaning of the rule for the purpose of analyzing whether a conflict of interest existed. *Id.* at 433-34. Because of counsel's continuing representation of the business, the court held that a likely conflict of interest existed when the attorney represented the husband in the dissolution proceeding.[2]

In concept, this case parallels what occurred in *In re Brandsness*. The "stranded costs" issues on which defendants' worked while employed for PGE are no different from

---

[2] It is enough for a violation of the rule if the representation of the present client "would likely" inflict injury on the former client.

the ongoing business affairs for which legal advice was rendered in that case. Those, "stranded costs" were the subject of controversy when defendants represented PGE in the Unbundling Task Force meetings and continued to be the subject of controversy under the Customer Choice Plan because it involves some of the very power agreements and facilities that defendants were involved in when they worked for PGE. Moreover, PGE offered evidence that defendants will continue to represent ICNU regarding stranded cost issues in PUC proceedings where ICNU will likely take a position adverse to PGE, giving rise to the need for injunctive relief. Under the circumstances, there can be no question that the "stranded costs" that arose in the Unbundling Task Force meetings and that led to the preparation of Schedule 77 are "other particular matters" that are significantly related to matters presently before the PUC or will be the subject of future controversies. Consequently, the majority errs when it holds that "stranded costs" are not a "particular matter" within the meaning of DR 5-105.

The majority's ruling leaves intact the injunction as to paragraph 2(e) despite the fact that it does not conclude that the stranded costs for generating facilities and power contracts that Horgen and Van Cleve worked on as lawyers for PGE are specific matters within the meaning of the rule. The majority's result is correct, despite its erroneous understanding as to what constitutes a "matter specific" conflict. I do not quarrel with the majority's holding that PGE does not identify any specific confidence or trade secret about stranded costs that defendants learned about while employed for PGE. However, the stranded cost issues on which defendants worked while employed for PGE are "matters" within the meaning of the rule, and defendants should be enjoined from representing ICNU on those matters. Therefore, I concur with the majority's result.